994 F.2d 449
 Clark MERSHON, Gary Mershon, and Paul Mershon, Appellees,
v.
William R. BEASLEY, Individually, and Missouri Farmers
Association, Inc., Appellants.
Clark MERSHON, Gary Mershon, and Paul Mershon, Appellants,
v.
Brian GRIFFITH, Individually, and Missouri Farmers
Association, Inc., Appellees.
 Nos. 92-2866, 92-2958.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 17, 1993.
Decided May 26, 1993.
 
 Bernard Rhodes, Kansas City, MO (R. Kent Sellers and Michael J. Abrams, on the brief), for appellants.
 Gwen G. Caranchini, Kansas City, MO, for appellees.
 Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 MORRIS SHEPPARD ARNOLD, Circuit Judge.
 
 
 1
 Between 1983 and 1987, brothers Clark, Paul, and Gary Mershon farmed as a partnership in Bates County, Missouri. During that time, they borrowed money through a line of credit with the Missouri Farmers Association (MFA). The loan was secured by a lien on the crops to be harvested by the Mershons. In mid-1987, after learning that the Mershons had deposited directly into their personal bank account a check from a buyer of some of their crops, the MFA filed a civil suit against the Mershons in state court to collect on the outstanding loan (the MFA won this suit in May, 1990).
 
 
 2
 At the same time that the state court civil suit was filed, the MFA made a criminal complaint against the Mershons, alleging that they had defrauded a secured creditor, namely, the MFA. The county prosecutor subsequently initiated criminal proceedings against the Mershons. Shortly thereafter, the Mershons filed a civil suit against the MFA and several individuals in federal court, seeking damages under state and federal law; the Mershons also sought an injunction against the state criminal action. The federal court denied the injunction; that denial was upheld on appeal. See Mershon v. Kyser, 852 F.2d 335 (8th Cir.1988) (per curiam ).
 
 
 3
 In early 1988, the Mershons appeared for a preliminary hearing on the state criminal charges. The state court found probable cause for prosecution. In late 1989, the county prosecutor withdrew from the criminal action, but the case was pursued by the state attorney general's office. In mid-1990, the state attorney general's office dropped the criminal charges against the Mershons.
 
 
 4
 The Mershons' federal civil suit came to trial in early 1991; by that time, the relevant claims were malicious prosecution and libel under state law (against the MFA) and conspiracy to deprive the Mershons of certain federal constitutional rights under 42 U.S.C. § 1983 (against the MFA; William Beasley, the MFA credit manager; and Brian Griffith, an MFA in-house lawyer). After an eight-day trial, a jury found for the Mershons on all claims. In mid-1992, the trial court granted a judgment notwithstanding the verdict (JNOV) to the MFA and Mr. Griffith on the § 1983 claim; in the event of reversal on that order, the trial court granted those two defendants a new trial on that count. The trial court left in place verdicts against the MFA on malicious prosecution and libel under state law and against Mr. Beasley under § 1983. Both sides appeal.
 
 
 5
 The MFA and Mr. Beasley appeal on five grounds--that the evidence was insufficient on all three counts with respect to conduct by them that reflected the lack of a reasonable belief that the Mershons had committed a crime; that the evidence was insufficient to prove a conspiracy between Mr. Beasley and the county prosecutor to deprive the Mershons of federal constitutional rights; that the evidence was insufficient on malicious prosecution in that the Mershons did not prove that testimony at the state probable cause hearing was false or that they prevailed in the state criminal action; that the libel count was based on privileged statements and was therefore, as a matter of law, not actionable; and that the trial court abused its discretion in denying a new trial to the MFA on the state law claims and to Mr. Beasley on the § 1983 claim.
 
 
 6
 The Mershons cross-appeal on two grounds--that the trial court was wrong in granting a JNOV to the MFA and Mr. Griffith on the § 1983 claim, and that the trial court abused its discretion in granting a new trial to the MFA and Mr. Griffith on that claim in the event of reversal as to the JNOV.
 
 
 7
 Because we hold, for the reasons stated below and after reading the entire trial transcript, that none of the three claims should have been submitted to the jury, we reverse the judgment below and remand the case for the entry of a judgment in favor of the defendants on all claims.
 
 I.
 
 8
 Mr. Beasley argues that the evidence was insufficient to show any agreement between him and the county prosecutor on a common goal of depriving the Mershons of federal constitutional rights, and therefore that he was entitled to a directed verdict or a JNOV on the § 1983 claim. (According to the trial court, the right in question was a fourth amendment guarantee of freedom from unreasonable seizure, criminal prosecution to collect a disputed civil debt being considered a sort of constructive seizure because of the restraining effect of a pending prosecution on a criminal defendant's freedom to go where he pleases.) In its order denying a JNOV to Mr. Beasley on this issue, the trial court referred to evidence that the county prosecutor was the son of a "substantial client" of the MFA, that the county prosecutor himself was an officer of a corporation that did "considerable business with [the] MFA," that multiple communications had taken place between Mr. Beasley and the county prosecutor, and that a check that implicated the Mershons at the state probable cause hearing had been altered by another employee at the MFA. The trial court concluded that "the totality of the evidence" established a submissible case on Mr. Beasley's alleged conspiracy with the county prosecutor. We disagree.
 
 
 9
 It is well settled that a private party may be held liable on a § 1983 claim if "he is a willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980). In construing that test in terms of the allegations necessary to survive a motion to dismiss, this circuit has held that a plaintiff seeking to hold a private party liable under § 1983 must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor. See, e.g., Smith v. Bacon, 699 F.2d 434, 436 (8th Cir.1983) (per curiam ); see also Holbird v. Armstrong-Wright, 949 F.2d 1019, 1020 (8th Cir.1991) (per curiam ); Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir.1985) (per curiam ); and White v. Walsh, 649 F.2d 560, 562 (8th Cir.1981). In order to survive a motion for summary judgment or for a directed verdict, evidence must be produced from which reasonable jurors could conclude that such an agreement was come to. See, e.g., Moore v. City of Paducah, 890 F.2d 831, 834-35 (6th Cir.1989); Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 435 (7th Cir.1986), cert. denied, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1352-53 (7th Cir.1985); and Fonda v. Gray, 707 F.2d 435, 438 (9th Cir.1983).
 
 
 10
 The jury instructions in this case stated that in order to find Mr. Beasley liable on the § 1983 claim, the Mershons had to prove that Mr. Beasley was "jointly engaged" with the county prosecutor "to violate plaintiffs' civil rights." We express no opinion with respect to whether this was an adequate formulation of the required proof. After reading the trial transcript, however, we are convinced that the evidence was insufficient as a matter of law on the question of a mutual understanding, or a meeting of the minds, between Mr. Beasley and the county prosecutor and therefore that the § 1983 claim against Mr. Beasley should not have been submitted to the jury.
 
 
 11
 It is undisputed that there were multiple contacts between Mr. Beasley and the county prosecutor, both by phone and by letter. The MFA was, however, the complaining party in the criminal case. We do not believe that the fact of these contacts, by themselves and without more, allows the inference that Mr. Beasley and the county prosecutor ever reached any mutual understanding that the MFA would use the criminal process for the purpose of collecting its civil debt. The Mershons offered no evidence, for example, that the MFA had sought criminal prosecution of other defaulting debtors in the past or, indeed, that the county prosecutor had filed criminal charges in the past against other debtors who had defaulted on loans from the MFA. See, e.g., Gramenos, 797 F.2d at 436.
 
 
 12
 The Mershons' theory as to why the county prosecutor would agree to misuse the power of his office seems to have been that a criminal conviction of the Mershons would have precluded the discharge in bankruptcy of the debt to the MFA that was secured by the crops sold, that the county prosecutor and his father were owed a debt that was secured by the same crops, and that a criminal conviction of the Mershons would therefore generate a similar exception to bankruptcy discharge of the debt owed to the county prosecutor and his father. We express no opinion on the accuracy of the Mershons' belief about the effect of a criminal conviction on the ability to discharge a debt in bankruptcy. We consider extremely attenuated, however, any connection, based on this theory, between the decision to prosecute and the personal benefit that the county prosecutor might have realized from pursuing the criminal action against the Mershons. Any inference of a mutual understanding that would be drawn from this tenuous connection between the county prosecutor and Mr. Beasley, in our view, could be the result only of "mere conjecture and speculation," Moore v. City of Paducah, 890 F.2d at 834.
 
 
 13
 "A party may not cry 'conspiracy' and throw himself on the jury's mercy.... There must be a genuine issue about a material fact.... Plausible inferences must be resolved in favor of [the Mershons], but the inferences [that the Mershons] press[ ] on us are not plausible." Gramenos, 797 F.2d at 436. Under the circumstances of this case, we hold that the trial court should have granted Mr. Beasley's motion for a directed verdict or for a JNOV on the § 1983 claim. See, e.g., Moore v. City of Paducah, 890 F.2d at 834-35; Gramenos, 797 F.2d at 436; and Moore v. Marketplace Restaurant, Inc., 754 F.2d at 1352-53. For similar reasons, we hold that the trial court was correct in granting a JNOV to the MFA and Mr. Griffith on the § 1983 claim.
 
 II.
 
 14
 In order to prevail on a malicious criminal prosecution claim under Missouri law where the plaintiff was actually bound over after a state court preliminary hearing, the plaintiff must prove that the defendant initiated a criminal proceeding that was resolved in favor of the plaintiff, that the defendant acted primarily for a purpose other than that of bringing an offender to justice, that the defendant acted without probable cause, that the probable cause determination reached at the state court preliminary hearing was procured by false or fraudulent testimony, and that the plaintiff was damaged as a result. See MAI § 23.07 (1991); see also Sanders v. Daniel International Corp., 682 S.W.2d 803, 807, 814 n. 4 (Mo.1984) (en banc ), and Kvasnicka v. Montgomery Ward and Co., 350 Mo. 360, 166 S.W.2d 503, 515 (1942).
 
 
 15
 The MFA challenges the verdict against it on the Mershons' malicious prosecution claim in two respects--first, on the sufficiency of the proof as to the use of false or fraudulent testimony to procure the probable cause determination at the state court preliminary hearing and, second, on the question of whether the state criminal prosecution was resolved in favor of the Mershons. The MFA argues that it was entitled to a directed verdict or a JNOV on the malicious prosecution claim because of insufficient evidence with respect to either or both of these elements of the claim.
 
 
 16
 In its order denying a JNOV to the MFA on this issue, the trial court stated only that "the plaintiffs made a submissible case that the probable cause determination was procured by false or fraudulent testimony" and did not specify the evidence that created a submissible case. We disagree, with respect to the question of the use of false or fraudulent testimony at the state court preliminary hearing, that the evidence was sufficient to establish a submissible case on the malicious prosecution claim.
 
 
 17
 The Mershons argue that the MFA's intent at the state court preliminary hearing was to "create the false impression that the [secured] crops were good and could and did yield more money than they actually did." The Mershons contend, therefore, that the MFA either acted primarily for a purpose other than that of bringing an offender to justice, or acted without probable cause, or both. We express no opinion on the merits of that argument. We note, however, that even if the Mershons are correct in those regards, they still had to prove, in order to prevail on the malicious prosecution claim, that the probable cause determination reached at the state court preliminary hearing was procured by false or fraudulent testimony. See MAI § 23.07 (1991); see also Kvasnicka, 166 S.W.2d at 515. On this question, we believe, they failed to establish a submissible case.
 
 
 18
 At trial, the Mershons offered four instances of allegedly false testimony or fraudulent evidence given at the state court preliminary hearing--a check implicating the Mershons that had allegedly been altered by an employee of the MFA; statements by Bill Cadle, an MFA employee, first, that the Mershons' crops had been planted by rows rather than through drilling and, second, that he had viewed the Mershons' crops and had found them to be plentiful; and a statement by Dan Chastain, another MFA employee, that Paul Mershon had been seen taking some crops to a grain elevator at a time when Paul Mershon was not even working on the Mershons' farms. The trial court specifically instructed the jury that the evidence as to the allegedly altered check could not be considered on the question of whether false or fraudulent testimony was offered at the preliminary hearing. The trial court further held, as a matter of law, that no evidence existed to show that the alleged alteration of the check in question affected the state court's finding of probable cause. We turn, then, to the three remaining statements cited by the Mershons.
 
 
 19
 The significance of a statement that the Mershons' crops were planted by rows rather than through drilled sections is apparently that crops planted by rows require less seed. Any estimate of yield extrapolated from the amount of seed initially purchased (and presumably planted) by the Mershons, then, would be higher if assumed to be derived from rowed crops rather than drilled ones. The Mershons contend that when the MFA calculated their presumed income from crops planted by rows, the amount estimated, and thus the amount unaccounted for to the MFA, was far too high.
 
 
 20
 We have read the transcript of the state court preliminary hearing. We do not see the relevance of this argument, given the undisputed facts that the Mershons did sell some crops yet never paid anything toward their debt to the MFA. Even if Mr. Cadle's testimony in this respect could be considered false or fraudulent, we hold that it could not have been material to the state court's finding of probable cause that the Mershons had sold secured crops with the intent not to repay the MFA for the loan given to them.
 
 
 21
 Nor do we find material the question of Mr. Cadle's opinion that the Mershons' crops were "good," "average," or "normal," as he characterized those crops during the state court preliminary hearing. Because the Mershons do not dispute that they sold some crops and that they never paid anything to the MFA on their debt, Mr. Cadle's opinion could not have been material to the state court's finding of probable cause.
 
 
 22
 Finally, we fail to see the materiality of any question relating to whether Paul Mershon was observed taking some crops to a grain elevator at a time when he was not even working on the Mershons' farms. In the first place, the transcript of the state court preliminary hearing actually reflects that the testimony was that Paul Mershon was observed planting crops, not harvesting them or transporting them. Even if the testimony had been as the Mershons contend, however, it could not have been material to the state court's finding of probable cause, given the Mershons' own acknowledgment that they sold some of the secured crops yet never paid anything to the MFA.
 
 
 23
 We hold that as to the question of whether the state court's probable cause determination was procured by false or fraudulent testimony, the evidence was insufficient to establish a submissible case. The trial court should, therefore, have granted a directed verdict on the malicious prosecution claim.
 
 III.
 
 24
 The basis of the libel claim as it was submitted to the jury was that the MFA (through Mr. Beasley) signed a criminal complaint against the Mershons that contained false statements, and that the MFA either knew that the statements were false or recklessly disregarded whether the statements were false "at a time when [Mr.] Beasley had serious doubt as to whether [the statements were] true." On appeal, the MFA argues that the statements in the criminal complaint were absolutely privileged under Missouri law since they were relevant to the state court proceeding on the criminal charges.
 
 
 25
 The Missouri courts have adopted a rule of absolute privilege for witnesses testifying in a judicial proceeding. See, e.g., Wright v. Truman Road Enterprises, Inc., 443 S.W.2d 13, 15 (Mo.Ct.App.1969). This immunity extends to statements made " 'preliminary to a proposed judicial proceeding.' " Id. at 16, quoting Restatement of Torts § 588, now Restatement (Second) of Torts § 588 at 250 (1977). In our view, then, Mr. Beasley's statements in the criminal complaint were absolutely privileged under Missouri law. See also Restatement (Second) of Torts § 587 at 248, § 587 comment b at 249, § 598 comment e (1977). Since the only basis for the libel claim was the criminal complaint, the MFA was entitled to judgment as a matter of law on this issue.
 
 IV.
 
 26
 For the reasons stated, we reverse the judgment below and remand the case for the entry of a judgment for the defendants on all claims.
 
 
 27
 FLOYD R. GIBSON, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 28
 I concur with the majority insofar as it affirms the district court on the issues raised in the Mershons' cross-appeal. I also agree that the statements made at the preliminary hearing are absolutely privileged under Missouri law, hence I concur in part III of the majority's opinion. However, I would affirm the district court on the § 1983 and malicious prosecution claims, and therefore I dissent from parts I and II of the majority's opinion.
 
 I. SECTION 1983 CLAIM
 
 29
 I am in substantial agreement with the majority's characterization of the law regarding the imposition of § 1983 liability on purely private actors. However, my reading of the record convinces me that there was sufficient evidence to permit the jury to find Beasley and Hugh Jenkins acted in concert. First, the majority downplays the potential personal benefit to the prosecutor; after all, he did have an interest in a company to which the Mershons owed money. Second, the Mershons' attorney testified MFA's attorney told her one of the reasons the criminal prosecution was being pursued was "to preserve an exception to discharge in bankruptcy." This same MFA attorney joined Jenkins at the counsel table during the preliminary hearing and, by his own admission, really had no purpose for being there. I believe that it was entirely reasonable for the jury to infer that Beasley and Jenkins both wanted to obtain the criminal conviction in order to protect their individual monetary interests.
 
 
 30
 The second, and perhaps more fatal, shortcoming in the majority's analysis is that it does not discuss the Mershons' second contention: that the criminal proceeding was filed to coerce payment of the civil debt. Several witnesses testified Beasley told them the charges would be dropped if the Mershons' debt were paid. Furthermore, Beasley made a note memorializing a telephone conversation with Jenkins stating that Jenkins would "try to make Mershons make restitution." This, in combination with Jenkins' testimony that using his position as prosecutor to collect a debt would be "illegal" and "improper," could have properly formed the basis for the jury's decision. Finally, the jury might have been convinced that prosecutor Jenkins was not acting wholly out of a desire to enforce the law when he conceded that he called the Mershons' attorney and suggested she surrender her clients because warrants would be issued for their arrest, even though his investigation had not yet been completed. In short, I think when the evidence is viewed in a light most favorable to the Mershons, a reasonable jury could have found Jenkins and Beasley jointly pursued the prosecution for improper and illegal reasons. I would not disturb the jury's verdict in this regard.
 
 II. MALICIOUS PROSECUTION
 
 31
 I dissent on this count because, in my opinion, the majority places too much emphasis on the need for false or fraudulent testimony. I believe the majority mischaracterizes Missouri law when it implies that an element of malicious prosecution is that "the probable cause determination reached at the state court preliminary hearing was procured by false or fraudulent testimony." Ante at 452. The Missouri Supreme Court has set forth six elements of the cause of action, none of which require that the state court determination be procured by false testimony. Sanders v. Daniel Inter'l Corp., 682 S.W.2d 803, 807 (Mo.1984) (en banc); see also MAI § 23.07 (1991). One of the elements does require that the defendant acted without "reasonable grounds," id. at 814 n. 4, and I concede that anyone who presents false or fraudulent testimony does not act with "reasonable grounds." However, this does not mean (as I think the majority implies) that false or fraudulent testimony is the only basis for proving someone has acted unreasonably. In determining whether someone has acted reasonably, it is obviously appropriate to consider the facts that they are aware of; additionally, it is proper to impute them with the knowledge that would have been discovered had a reasonable investigation been conducted. E.g., Dodson v. MFA Ins. Co., 509 S.W.2d 461, 467 (Mo.1974). With these provisos in mind, I recount the facts that could have been found by the jury.
 
 
 32
 The Mershons' crop on the Jenkins farm was sold for $119,000; however, the Mershons owed W.K. Jenkins $125,000 for rent. W.K. Jenkins was paid before MFA because MFA had subordinated its lien to Jenkins' landlord lien. This left no money to pay MFA. Although grain was harvested from other farms, it brought in relatively small amounts of money. The elevators issued checks for this grain, but the checks were paid solely to the Mershons. This was not unusual, as the Mershons had received checks made payable solely to them in the past, MFA knew this had happened in the past, and MFA had not given the Mershons any instructions indicating this was somehow improper. These checks were deposited in an account supervised by the Farmers Home Administration (FHA); this was done because, in the past, MFA had endorsed checks made payable to the Mershons and MFA jointly with the understanding the checks would be deposited in the supervised account. To say that the account was "supervised" meant that FHA made sure the money was used for certain permissible uses, including living expenses. Unfortunately, none of these facts were disclosed to the prosecutor or to the judge at the preliminary hearing, even though the prosecutor conceded at this trial that some of these facts might have been important to his decision to prosecute. There also appears to have been no inquiry as to the status of the Mershons' debt to W.K. Jenkins. As stated by various MFA representatives, the criminal action was pursued simply because they knew grain had been sold and they had not gotten any money. Finally, there is the possibility the jury believed MFA witnesses lied at the preliminary hearing as to the status of the Mershons' harvest.
 
 
 33
 These facts, if found by the jury, would have reasonably supported its verdict that MFA did not act reasonably. By inflating the amount of crops grown by the Mershons, MFA left the implication that more money was raised; however, an investigation would have revealed that there wasn't even enough money raised to pay W.K. Jenkins' landlord lien, much less the subordinate lien possessed by MFA. As for the proceeds from crops on other farms, the Mershons simply followed a practice that they had followed in prior dealings--which would have been vital in determining whether they intended to defraud MFA. Because these facts support the jury's verdict, I would affirm its decision.
 
 III. CONCLUSION
 
 34
 Because I believe there was sufficient evidence to support the jury's verdict on these two claims, I find it difficult to conclude the district court should have directed verdicts in MFA's favor. Consequently, I would affirm on both of these counts.