# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1974

_____

Jane Doe, (a pseudonym)

*Plaintiff - Appellant*

v.

North Homes, Inc., individually, doing business as North Homes Children and Family Services and I.T.A.S.K.I.N. Juvenile Center; Devin Michael Wood, in his individual capacity; Connie Ross, in her individual and official capacities; John Does 1–5, in their individual capacities; John Does 6–10, in their individual and official capacities

*Defendants – Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: March 18, 2021
Filed: August 24, 2021
_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

North Homes, Inc. confined fifteen-year-old Jane Doe in its residential correctional unit where an employee sexually assaulted her for three days. No one intervened. In this case, we decide whether Doe plausibly alleged that North

Homes—a private entity—qualifies as a state actor under 42 U.S.C. § 1983. Because she did, we reverse, in part.

## I. Background

At this stage, we take Doe's factual allegations as true and draw inferences in her favor. Fed. R. Civ. P. 12(b)(6); *see also Does 1-2 v. Regents of the Univ. of Minn.*, 2021 WL 2197073, at *1 (8th Cir. June 1, 2021). We use this necessarily one-sided narrative to answer the limited question before us. *Does 1-2*, 2021 WL 2197073, at *1. We do not use it to reach the merits of Doe's claims. *See id.*

North Homes owns and operates correctional and rehabilitative facilities for juveniles in Northern Minnesota. To operate I.T.A.S.K.I.N. Juvenile Center (the "Juvenile Center"), North Homes "worked in concert" with Itasca County and other counties "to provide care for minor children who were detained, incarcerated, committed, or the like, for criminal, mental health, or other protective purposes."

An interagency agreement between Minnesota's Department of Corrections and its Department of Human Services authorized and licensed the Juvenile Center to run two residential units: (1) the DOC unit; and (2) the DHS unit. The agencies jointly operated those units under their interagency agreement's terms. Through "statutory and regulatory authority[,] and/or court orders," North Homes could move residents between the two units at its discretion.

Connie Ross (North Homes's director and administrator) managed both units. In turn, those units supervised residents "24/7." The units "entirely restricted" residents' "libert[ies]." And residents could not leave "on their own volition[.]"

In early 2014, Doe, a young woman diagnosed with bipolar and substance-use disorders, arrived at the Juvenile Center. Kanabec County (Doe's legal custodian), and her foster parent, enrolled Doe at the Juvenile Center for mental health and behavioral help. At first, the Juvenile Center placed her in the DHS unit.

Several months later, however, staff "involuntarily detained" her in the DOC unit "for behavioral issues." Supervisors and staff knew about, and received training on, Doe's serious medical needs. And by statute, they were all obligated to report child abuse (including sexual abuse) to police. *See* Minn. Stat. § 260E.06.

Soon after her detainment, Devin Michael Wood—a twenty-three-year-old corrections officer for the DOC unit—"groomed and made sexual advances towards" Doe. Then, for three days, Wood "engaged in sex acts, including intercourse, with [Doe]." Those acts intensified Doe's serious medical needs.

For three days, no employees stepped in to help Doe despite constant monitoring. None complied with the child-abuse-reporting requirement, either. This conduct aligned with how employees (including Ross) "regularly turned a blind eye towards inappropriate and sexual relationships between residents and staff[.]" It also reflected how employees "encouraged a 'code of silence'" to protect their "predatory" colleagues.

On the fourth day, police arrested Wood for criminal sexual conduct. Blaming Doe for Wood's arrest, staff members verbally harassed her. The harassment triggered even more emotional and psychological harm. Despite knowing about the verbal harassment, Ross and others did not stop it.

With the arrest fallout still ongoing, Doe told Ross about "another staff member . . . engaging in a sexual relationship with a minor resident." Ross responded by directing employees to detain, punish, and silence Doe—in the DOC unit.

Months later, Wood pled guilty to three counts of third-degree sexual conduct. *See* Minn. Stat. § 609.344(m).

Doe sued North Homes, Ross, and Wood, as well as other employees, alleging three § 1983 counts: (1) Eighth and Fourteenth Amendment claims against the employees; (2) a *Monell* claim against North Homes and Ross for creating an environment "where children . . . were regularly subjected to sexual abuse"; and (3) a First Amendment claim against Ross.

While characterizing North Homes as a "nominally private entity," Doe alleged that "[it] acted under color of state law because [it] fulfilled the public function of juvenile incarceration, detainment, and commitment, and acted in concert with state actors in denying [Doe] her federal civil rights." By virtue of their employment at North Homes, Doe's complaint treated all defendant employees as state actors, too. Ultimately, the district court saw "at most, the passive involvement of the state in the circumstances leading to her alleged constitutional deprivations." Concluding that there was a lack of state-actor allegations, the district court held that Doe's § 1983 claims failed.[1]

## II. Discussion

We review Rule 12(b)(6) dismissals de novo. *See Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 534 (8th Cir. 2014). In doing so, we use judicial "experience and common sense" to decide if Doe's "complaint crosse[d] over the plausibility threshold." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Magee*, 747 F.3d at 535. So, we ask if Doe's allegations let us "draw the reasonable inference that [North Homes] is liable for the misconduct alleged." *Id.*

Only a state actor can face § 1983 liability. *See Youngblood v. Hy-Vee Food Stores*, 266 F.3d 851, 855 (8th Cir. 2001). But "in a few limited circumstances," a private entity "can qualify as a state actor," including "when the private entity

---

[1]Because this appeal only concerns the state-actor question, we do not address other § 1983 issues or the decision to abstain from exercising supplemental jurisdiction over a negligence claim.

performs a traditional, exclusive public function," and "when the government acts jointly with the private entity." *Halleck v. Manhattan Cmty. Access Corp.*, 139 S. Ct. 1921, 1928 (2019) (internal citations omitted).

Still, the state-actor question presents a "necessarily fact-bound inquiry[.]" *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982). First, we ask if the claimed deprivation "resulted from the exercise of a right or privilege having its source in state authority." *Id.* And second, we ask if "under the facts of this case," we may "appropriately characterize[]" North Homes as a state actor. *Id.* "Our ultimate conclusion must turn on the particular facts of the case, since only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) (cleaned up)).

Here, we must decide if Doe plausibly alleged that North Homes performed a public function when it detained her.

The power to decide to incarcerate a person rests with the state.[2] *See, e.g.*, *Chapman v. United States*, 500 U.S. 453, 465 (1991) (explaining that "the Government may not punish" a person "unless and until it proves his guilt . . . at a criminal trial" with "the relevant constitutional guarantees[,]" and then post-conviction, "the court may impose, whatever punishment is authorized by statute" if

---

[2]The same goes for the power to decide to civilly detain a person. *See Kansas v. Hendricks*, 521 U.S. 346, 357 (1997) ("States have in certain narrow circumstances provided for the forcible civil detainment of people [and the Court [has] consistently upheld such involuntary commitment statutes [when] the confinement takes place pursuant to proper procedures and evidentiary standards."). We see a similar pattern in how the law treats juveniles, generally. *See Schall v. Martin*, 476 U.S. 253, 264–65 (1984) (explaining that our legal system generally only allows parents to "control" juveniles, and only "if [that] control falters," can the state intervene to protect the juvenile or to protect the community).

the punishment does not violate the Constitution); *see also Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (per curiam) ("Clearly, confinement of wrongdoers—though sometimes delegated to private entities—is a fundamentally governmental function.").

And so, only the state can decide to delegate that power. *Cf. West v. Atkins*, 487 U.S. 42, 56–57 (1988) (private doctor "fully vested with state authority" performed public function of treating prisoners, which flowed directly from the state's decision to incarcerate those prisoners); *see also Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 752, 754 (6th Cir. 2020) (deciding that providing housing and treatment for at-risk youth did not amount to a public function while distinguishing that facility from one that "*incarcerat[es] children placed under its care*" (emphasis added)).

Even so, we can see how that conclusion may seem at odds with *Richardson v. McKnight*'s statement: "correctional functions have never been exclusively public." 521 U.S. 399, 405 (1997). But *Richardson* expressly limited its scope to § 1983 immunity, not § 1983 liability. *Id.* at 413; *accord Holly v. Scott*, 434 F.3d 287, 299–300 (4th Cir. 2006) (Motz, J., concurring in judgment) (explaining that *Richardson* "deals only with a private person's immunity from liability"). And, in upholding a qualified-immunity denial, *Richardson* expressly left the state-actor question for the district court to decide. 521 U.S. at 413–14. While one circuit saw *Richardson* as dispositive on the public-function question, others did not. *Compare Holly*, 434 F.3d at 293, *with Rosborough*, 350 F.3d at 460–61 ("We agree with the Sixth Circuit and with those district courts that have found that private prison-management corporations and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury."); *see also Skeleton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (private-prison management performed traditional state function).

Against that legal landscape and through the *Iqbal* standard, we sift the facts alleged here. Doe alleged that North Homes cared for juveniles whose liberties the

-6-

state (counties) decided to restrict. She also alleged that the state (agencies) agreed to empower North Homes to run two units, through which North Homes could deprive residents of their liberties. And she alleged that the state (legislature, agencies, and courts) gave North Homes the power to detain residents in a correctional facility whenever it wanted and for whatever reason it saw fit.

While conceding Doe's inability to leave the DOC unit, North Homes could not tell us *why* she could not leave (i.e., whose authority kept her there). True, involuntary commitment may not amount to a public function[3]—but Doe's complaint did not rest on the involuntary character of her commitment. *Cf. Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 166–67 (3d Cir. 2001) (no involuntary detention when minor child's mother and state committed him to residential school). Instead, she alleged that North Homes moved her to, and detained her in, a *corrections* unit, where the alleged abuse occurred. *See Howell*, 976 F.3d at 753 (holding a foster home was not a state actor in part because it "has no power to remove children and place them . . . in juvenile correctional facilities—the kinds of things state actors traditionally may do"). She also alleged that North Homes later detained her in the *corrections* unit to punish and silence her efforts to report abuse.

Construing the complaint in her favor, we conclude that Doe plausibly alleged that North Homes's exercise of a public function (the state's authority to detain her) caused her involuntary detainment in a *corrections* unit. As a result, we disagree with the decision to dismiss Doe's § 1983 claims at the pleading stage.[4]

---

[3]*See, e.g.*, *Wittner v. Banner Health*, 720 F.3d 770, 776–77 (10th Cir. 2013); *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 8 (1st Cir. 2005); *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 172 (3d Cir. 2004); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 243 (5th Cir. 1999); *S.P. v. City of Takoma Park*, 134 F.3d 260, 269 n.7 (4th Cir. 1998); *Ellison v. Garbarino*, 48 F.3d 192, 195–96 (6th Cir. 1995); *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992); *Spencer v. Lee*, 864 F.2d 1376, 1379–80 (7th Cir. 1989) (en banc).

[4]Because Doe meets the state-actor requirement at the pleading stage (via public-function analysis), we need not decide if she could chart an alternate path to

## III. Conclusion

For these reasons, we reverse the judgment and remand the case for proceedings consistent with this opinion.

GRUENDER, Circuit Judge, dissenting.

To state a claim under § 1983, a plaintiff must allege facts sufficient to show that the defendant acted under color of state law and that the defendant's conduct violated a federally protected right. *Green v. Byrd*, 972 F.3d 997, 1000 (8th Cir. 2020). Only the first element is at issue here.

Although "§ 1983 excludes from its reach merely private conduct," *Campbell v. Reisch*, 986 F.3d 822, 824 (8th Cir. 2021), "a private entity can qualify as a state actor," triggering § 1983 liability, "in a few limited circumstances," *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. ---, 139 S. Ct. 1921, 1928 (2019). One such circumstance is "when the private entity performs a traditional, exclusive public function." *Id.* "The Court has stressed that 'very few' functions fall into [this] category." *Id.* at 1929 (quoting *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 158 (1978)). "It is not enough that the federal, state, or local government exercised the function in the past, or still does." *Id.* The private party must be performing a function that was "traditionally the *exclusive* prerogative of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).

The court concludes that Doe alleged facts sufficient to show that North Homes qualifies as a state actor under the public-function test. I disagree. Although the court alludes to several functions, it never identifies one that is both "the

---

the same endpoint (via joint-action analysis). *See Lugar*, 457 U.S. at 939 ("Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation need not be resolved here.").

*exclusive* prerogative of the State," *id.*, and a function that Doe alleged North Homes was performing when she suffered the abuse.

For example, the court alludes to the function of incarceration as punishment for a crime. *See ante*, at 5-6 (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991), for the proposition that it is the government's business to "punish" a person once "it proves his guilt beyond a reasonable doubt at a criminal trial," and *Rosborough v. Management & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (per curiam), for the proposition that "confinement of wrongdoers" is a public function). But even assuming that incarceration as punishment for a crime is an exclusive public function, *but see Holly v. Scott*, 434 F.3d 287, 293 (4th Cir. 2006) ("The Supreme Court's analysis in [*Richardson v. McKnight*, 521 U.S. 399 (1997)] precludes argument that the operation of a prison is a traditionally exclusive state function."), it was not a function that Doe alleged North Homes was performing when she suffered the abuse. On the contrary, the complaint indicated that Doe was enrolled in North Homes "to address her serious mental health and behavioral needs," not as punishment for a crime.

The court also alludes to the function of involuntary detention generally, whether criminal or civil. *See ante*, at 5 & n.2 (noting that the state has the power not only "to incarcerate a person" but also "to civilly detain a person"). Again, however, involuntary detention is not a function that Doe alleged North Homes was performing when she suffered the abuse. On the contrary, the complaint indicated that Doe's foster mother and Kanabec County enrolled Doe in North Homes. *See Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 163, 166-67 (3d Cir. 2001) (Alito, J.) (holding that a minor's placement in a school that did not allow students "to leave campus without supervision" "was not 'involuntary' in the [relevant] sense" because "his legal custodian, DHS, wanted him placed there, and his mother consented"). And in any event, involuntary detention is not an exclusive public function. *See, e.g.*, Minn. Stat. §§ 253B.02, subd. 19, .141, .18 (providing for involuntary civil detention in "non-state-operated" "treatment facilit[ies]"); Minn. Stat. § 629.366 (authorizing merchants to detain suspected shoplifters); *Youngblood v. Hy-Vee Food*

-9-

*Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) (denying that detaining a suspected shoplifter constituted state action for § 1983 purposes); *Wittner v. Banner Health*, 720 F.3d 770, 776-77 (10th Cir. 2013) (denying that involuntary commitment is an exclusive state function); *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 8 (1st Cir. 2005) (same); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 243 (5th Cir. 1999) (same); *S.P. v. City of Takoma Park*, 134 F.3d 260, 269 n.7 (4th Cir. 1998) (same); *Ellison v. Garbarino*, 48 F.3d 192, 195-96 (6th Cir. 1995) (same); *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992) (same); *Spencer v. Lee*, 864 F.2d 1376, 1379-80 (7th Cir. 1989) (en banc) (same); *White v. Scrivner Corp.*, 594 F.2d 140, 142 (5th Cir. 1979) ("A merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state."). Thus, the court rightly retreats from the position that involuntarily detaining Doe is what transformed North Homes into a stator actor for § 1983 purposes. *See ante*, at 7 (conceding that "involuntary commitment may not amount to a public function" and clarifying that, in its view, "Doe's complaint did not rest on the involuntary character of her commitment").

So, what *does* the court think transformed North Homes into a stator actor for § 1983 purposes? The court stresses Doe's allegation that the abuse occurred after she was transferred to a unit in the corrections facility due to behavioral issues. *See ante*, at 7. But the location where North Homes housed Doe does not change the fact that North Homes was neither incarcerating her as punishment for a crime nor detaining her "involuntarily" in the relevant sense. *See Robert S.*, 256 F.3d at 166-67. If involuntary criminal confinement is likely not an exclusive public function, *see Richardson*, 521 U.S. at 405 ("[C]orrectional functions have never been exclusively public."), and involuntary *civil* confinement is definitely not an exclusive public function, *see Spencer*, 864 F.2d at 1380-81 ("[I]nvoluntary extrajudicial commitment to private institutions has long been commonplace."), then it is difficult to see why *voluntary civil* confinement should nonetheless qualify as an exclusive public function simply because it occurs in a unit licensed by the state department of corrections. Thus, I agree with the district court that Doe did not

allege facts sufficient to show that North Homes qualified as a state actor under the public-function test.

I also agree with the district court that Doe did not allege facts sufficient to show that North Homes qualified as a state actor under the joint-action test. "[A] private party may [also] be held liable on a § 1983 claim if he is a willful participant in joint action with the State or its agents." *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993) (internal quotation marks omitted). That said, the joint-action standard imposes a high bar. To survive a motion to dismiss, a plaintiff "must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Id.* Importantly, "mere approval or acquiescence of the state" is not enough. *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007). Further, the plaintiff must allege a "close nexus not merely between the state and the private party, but between the state and the alleged deprivation itself." *Id.* (internal quotation marks omitted). After carefully reviewing Doe's complaint, the district court concluded that it fell short of this demanding standard. After doing the same, I agree.

For the foregoing reasons, I would affirm the district court's dismissal of Doe's complaint. Accordingly, I respectfully dissent.

_____