*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0040p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

DOUGLAS R. PARKS,

*Plaintiff-Appellant,*

v.

CITY OF COLUMBUS, RICHARD C. PFEIFFER, JR., in his official capacity as City Attorney for the City of Columbus, Ohio, and JAMES G. JACKSON, in his official capacity as Chief of Police, for the City of Columbus, Ohio,

*Defendants-Appellees.*

No. 03-4096

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00489—James L. Graham, District Judge.

Argued: October 26, 2004

Decided and Filed: January 25, 2005

Before: KEITH, CLAY, and BRIGHT, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Nathan W. Kellum, ALLIANCE DEFENSE FUND, Memphis, Tennessee, for Appellant. Glenn B. Redick, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees. **ON BRIEF:** Nathan W. Kellum, ALLIANCE DEFENSE FUND, Memphis, Tennessee, for Appellant. Glenn B. Redick, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees.

---

## OPINION

---

DAMON J. KEITH, Circuit Judge. Plaintiff appeals the district court's denial of declaratory and injunctive relief in this case involving an alleged infringement upon Plaintiff's First and Fourteenth Amendment freedom of speech rights. For the reasons that follow, we **REVERSE** the district court's decision and **REMAND** for proceedings consistent with this opinion.

---

[*]The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1

# I.

Plaintiff Douglas Parks ("Parks") attends public events to proclaim and communicate his religious beliefs by wearing signs, singing, preaching, distributing leaflets, or talking to people.   Every June, the Columbus Arts Council ("Arts Council") organizes the Columbus Arts Festival ("Arts Festival"), which is held along the riverfront in downtown Columbus, Ohio, on Civic Center Drive.  Civic Center Drive is the closest road running parallel to the river.  Barricades are placed at several intersections of Civic Center Drive and its perpendicular streets to prevent automobiles from traveling down Civic Center Drive.  During the Arts Festival, Civic Center Drive is open to pedestrians and vendors who set up along side the road.

For festivals of this kind, the City of Columbus ("City") requires the event sponsors to obtain a block party permit.  Columbia City Code  § 923.03 ("No person shall use any public street to conduct a block party . . . without first obtaining a block party permit.").  A block party means "the closing of one (1) or more public streets between one (1) or more intersections for the common purpose of . . . the community at large, other than for a parade or commercial activity."  *Id.* § 923.01.  Block party permits are issued for the non-exclusive use of the permitted area.  Joint Appendix ("J.A.") at 133.

Here, the City issued a permit to the Arts Council for the Arts Festival.[1]  According to the permit, the stated purpose of the Arts Festival is "to bring visual and performing artists to the city." *Id.* at 134.  The permit is non-exclusive, which, according to the testimony of a special events coordinator for the City, means that "it is for free events open to the public."  *Id.* at 82.  The permit requires the event sponsor to carry liability insurance, *id.* at 133, and to comply with local and state rules regarding traffic and safety, *id.* at 144.  The permit also specifies that "Special Duty Police are required as a condition of this permit."  *Id.* at 133.  The Columbus Division of Police, Fire and Transportation, as well as the Division of Refuse must authorize the permit.  *Id.* at 147.  The Arts Council obtained permission through special ordinance to regulate the sale of alcohol within the permitted area.

On June 8, 2002, Parks attended the Arts Festival wearing a sign bearing a religious message.[2]  Parks walked up Civic Center Drive, which was barricaded from vehicular traffic, in the middle of the Arts Festival.  When Parks attempted to walk back down Civic Center Drive, he was approached by Officer Farr, an off-duty police officer for the City of Columbus who the Arts Council hired to serve as security.  Although he was off-duty, Officer Farr was wearing his police uniform and his badge.  Officer Farr approached Parks as he distributed the literature, identified himself as an officer, and informed Parks that the sponsor of the event did not want him there.  He instructed Parks to move beyond the barricades and told Parks that he would be arrested if he did not comply.  Because Parks feared arrest, he obeyed Officer Farr's order to leave the barricaded area.  He did not continue engaging in his activity outside the barricades, as he thought that it would be futile considering that the bulk of the people were inside the barricaded area on Civic Center Drive.  Parks wanted to attend the Jazz & Rib Festival, a similar festival held in July 2002 at the same location, in order to communicate his religious beliefs, but he was deterred from going because of the incident at the Arts Festival.

In December 2002, Parks's counsel sent a letter to James Jackson, Chief of Police for the City of Columbus, seeking relief from the ban imposed upon Parks during the Arts Festival.  Richard Pfeiffer, the City Attorney, responded to the letter on February 3, 2003, and stated that the permitted area in which Parks was distributing leaflets was "not a public area where [Parks] would have had traditional First Amendment

---

[1]Information related to the permit is gleaned from a copy of the specific permit at issue in this case, a copy of which is contained in the Joint Appendix.

[2]The record does not contain the details of Parks's message.

rights. Rather, the area was being used by a private group for their own purposes." *Id.* at 32. The City therefore concluded that there was no infringement on Parks's constitutional rights. *Id.* at 33.

On May 28, 2003, Parks filed a complaint against the City of Columbus, Police Chief James Jackson, and City Attorney Richard Pfeiffer (collectively "City" or "Defendants") seeking injunctive relief, declaratory relief, and damages pursuant to 18 U.S.C. §§ 1983 & 1988. On July 11, 2003, the district court granted Parks's motion for an expedited hearing regarding his request for a preliminary injunction.[3] On July 17, 2003, the court conducted a motions hearing and, because none of the facts were in dispute, the hearing was converted to a trial on the merits. In its opinion, the district court specifically indicated that it need not reach a decision as to the type of forum created under the City's block party permit. Instead, the court denied injunctive relief by finding that "Officer Farr's conduct was not a public function because it could have been performed by a member of the Arts Council or a private security officer." J.A. at 257. Moreover, because Officer Farr was enforcing the rules of the permit holder, the district court found that there was no state action and judgment was entered in favor of Defendants on all claims. *Id.* at 258. Parks's complaint was dismissed with prejudice and costs were taxed against him.

On appeal, Parks asserts that festivals, which are free and open to the public held pursuant to a non-exclusive block party permit, are traditional public fora. He argues that the City of Columbus—not the private entity hosting the festival—deprived him of his constitutionally protected right to freedom of speech. We agree.

## II.

In this case, Parks's motion for a preliminary injunction hearing was converted to a trial on the merits. Generally, we "review[] a challenge to the grant or denial of a request for permanent injunction under an abuse of discretion standard." *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 618 (6th Cir. 1999). If, however, a lower court's decision to grant or deny a permanent injunction rests on conclusions of law, we review the record de novo. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). Because constitutional issues are at hand, we shall "conduct an independent review of the record." *Women's Med. Profession Corp. v. Voinovich*, 130 F.3d 187, 192 (6th Cir. 1997).

To determine whether the City violated Parks's First Amendment right to free speech, we must follow the test set forth by the United States Supreme Court in *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788 (1985). First, we must decide whether Parks's speech is protected under the First Amendment. *Id.* at 797. Second, "we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* Last, we must determine if the City's reasons for prohibiting Parks's speech satisfy the appropriate standard. *Id.* Each prong will be addressed in turn.

## A.

The First Amendment to the Constitution, applicable to state and local governments through the Fourteenth Amendment, mandates that no law shall "abridg[e] the freedom of speech." U.S. Const. amend. I; *see also Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 44 (1983). In particular, "oral and written dissemination . . . [of] religious views and doctrines is protected by the First Amendment." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Moreover, "the hand distribution of religious tracts is an age-old form of missionary evangelism," *Murdock v. Pennsylvania*, 319

---

[3]Parks filed a motion for an expedited hearing on May 28, 2003, with the hope of receiving relief in time to participate in the Jazz & Rib Festival on July 18-21, 2003. Because there is no evidence that Parks would have been excluded from that particular festival, our opinion does not offer any further consideration of the injunctive relief requested related to the Jazz & Rib Festival.

U.S. 105, 108 (1943), and such activity "has the same claim as the others to the guarantees of freedom of speech and freedom of the press," *id.* at 109. *See also Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 161-62 (2002) (summarizing *Murdock* and other cases discussing the First Amendment protection afforded to proselytizers).

In the instant case, Parks testified that he was walking up and down Civic Center Drive in downtown Columbus wearing a sign bearing religious inscriptions. He also indicated that he was distributing religious literature to anyone who would accept it and preaching to anyone who would listen. His testimony was undisputed by the City. After reviewing the record before us, we find that, by distributing literature, displaying a religious message, and preaching to those interested, Parks was engaging in religious activity that has been recognized as protected speech under the First Amendment.

**B.**

While the district court indicated that "[t]he city cannot require the Arts Council and the Chamber of Commerce to include messages that [they] do[] not wish to convey simply because the event is being held on what is normally a traditional public forum," J.A. at 247-48, it nevertheless found it unnecessary to determine the type of forum at issue. Contrary to the district court's conclusion, we believe that we must first determine whether the streets remained a traditional public forum notwithstanding the non-exclusive, block party permit issued to a private organization. As explained below, we hold that the streets upon which Parks wished to exercise his First Amendment rights remained a traditional public forum.

"Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (quoting *Perry*, 460 U.S. at 45). It has been well-established by the United States Supreme Court and upheld by this Circuit that public streets generally constitute traditional public fora. *Frisby v. Schultz*, 487 U.S. 474, 481 (1985) (noting that "public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum"); *Perry Educ. Assn.*, 460 U.S. at 45 (stating that streets and parks are "quintessential public forums"); *United States v. Grace*, 461 U.S. 171, 177 (1983) (stating that "'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums'"); *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) (indicating that streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); *see also United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 452 (6th Cir. 2004) (restating Supreme Court rule that a street is a public forum); *Chabad of S. Oh. & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 434 (6th Cir. 2004) (same); *Dean v. Byerley*, 354 F.3d 540, 550 (6th Cir. 2004) (same); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004) (same); *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (same).

We recognize, however, that there have been limited circumstances where public streets or sidewalks are not considered public fora. *See, e.g., United States v. Kokinda*, 497 U.S. 720, 727 (1990) (plurality) (postal service sidewalk was not public thoroughfare and was "constructed solely to provide for the passage of individuals engaged in postal business"); *Greer v. Spock*, 424 U.S. 828, 838 (1976) (sidewalks in military reservation are not a public forum because they have not "traditionally served as a place for free public assembly and communication of thoughts by private citizens"); *but see Grace*, 461 U.S. at 1708 (finding that sidewalks adjacent to United States Supreme Court building are indistinguishable from other sidewalks and should maintain public forum status). Thus, to determine whether a public place constitutes a traditional public forum, we must look to the purpose of the forum and whether it has been customarily used for communication and assembly. *See, e.g., Hague*, 307 U.S. at 515. Moreover, "[u]se of a forum as a public thoroughfare is often regarded as a key factor in determining public forum status." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1101 (9th Cir. 2003) (citing *Kokinda*, 497 U.S. at 727-28). Along these lines,

we have recently held that a privately-owned sidewalk operates as a traditional public forum because, *inter alia*, it is a "public thoroughfare" as it "is open to the public for general pedestrian passage." *United Church of Christ*, 383 F.3d at 452. As we stated in that case, to determine if a sidewalk (or, in our case, a street) is in fact a traditional public forum will be a "case-by-case inquiry in which no single factor is dispositive." *Id.* at 453.

Applying the above principles to this case, we must decide whether the permitted streets remained a traditional public forum. The district court stated that "streets which are part of the festivals become a limited public forum as the city intended to create at most a limited public forum and had the power to do so." J.A. at 247 n.4. To support its statement, the district court cited our unpublished decision in *Bishop v. Reagan-Bush '84 Committee*, 819 F.2d 289, 1987 WL 35970 (6th Cir. May 22, 1987), and two non-binding district court cases, *Parkland Republican Club v. City of Parkland*, 268 F. Supp. 2d 1349 (S.D. Fla. 2003), and *People for the Ethical Treatment of Animals v. Guiliani*, 105 F. Supp. 2d 294 (S.D.N.Y. 2000) ("*PETA I*").[4] Consistent with the district court's dicta, the City argues on appeal that it "may create a limited public forum by temporarily reserving a portion of what is a traditional public forum for a limited purpose and for discussion of certain topics." Appellee's Br. at 20 (citing *Parkland Republican Club*, 268 F. Supp. 2d at 1357). Both the district court and the City have erred in relying on these cases, as they involve circumstances where the speaker attempted to interfere with the expressive message conveyed by the permit-holder.

First, *Bishop* involved a political rally organized pursuant to a city permit in downtown Cincinnati at "Fountain Square" where President Ronald Reagan was speaking. 1987 WL 35970, at **1. The rally was held as part of President Reagan's re-election campaign. *Id.* Although the rally was held in a public area, there were checkpoints and entryways, and all those "carrying signs, whether in favor of or against the President, were required to abandon those signs as a condition of entering the rally." *Id.* Plaintiffs claimed that once past the entrance, they were offered signs that promoted Reagan's candidacy. Plaintiffs argued that these actions violated their First Amendment right to free speech. The district court found that "issuance of the permit conferred on the defendants the right to *exclusive* use of the Square with the concomitant right to place whatever conditions they desired on the rights of those attending their 'private' function." *Id.* at **2. We rejected the district court's analysis and reasoned that "[s]uch analysis gives no consideration to the possibility that the nature of certain public forums *cannot* be altered, either by governmental fiat or private will." *Id.*

Contrary to the district court's insinuation in the current case before us, we did *not* hold in *Bishop* that a municipality may transform a traditional public forum into a limited public forum. We never reached that question, but rather remanded the case with instruction to the district court that if it found "that it *was* the City's intent to confer exclusive use of the forum to Reagan-Bush '84, [then] it must resolve the question of whether they had the *power* to do so." *Id.* at **3.[5] In fact, in *Bishop* we specifically noted that other

---

[4] In the case before us, the district court cited the first opinion issued in the case involving the People for the Ethical Treatment of Animals ("PETA"). The United States District Court for the Southern District of New York, however, issued a second opinion that adopted the reasoning from the first case and granted summary judgment for the Defendants. *See People for the Ethical Treatment of Animals v. Giuliani*, 2000 WL 1639423 (S.D.N.Y. Oct. 31, 2000) ("*PETA II*"). Language from both opinions is relevant to our discussion in the instant case.

[5] While we need not determine if the City has the power to transform a traditional public forum into a non-public forum, we note that the City cannot transform a traditional public forum simply because it so desires. *See United States Postal Serv. v. Council of Greenburgh Civic Ass'ns.*, 453 U.S. 114, 133 (1981) (noting that state "may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums").

jurisdictions have been conflicted as to whether a city may transform a traditional public forum. *See id.* at **3 n.3.[6] Thus, the district court's reliance on *Bishop* is improper.

Second, the district court's reliance on two cases, *Parkland Republican Club* and *PETA I*, is also improper. As a technical matter, we have no obligation to consider these cases because they are non-binding. Yet even if they were binding, they do not provide guidance in the instant case because those cases involve situations that are factually distinct. In *Parkland Republican Club*, the plaintiff—a political club—argued that the City of Parkland's policy, which "allows marching bands, youth, and civic organizations to participate in the Parkland Days Parade . . . , but excludes political organizations from participating if they identify themselves as a political organizations," violated its First Amendment right to free speech. 268 F. Supp. 2d at 1351. There, the court concluded that the parade was a limited public forum and noted that "the Club [wa]s free to attend the festival at large and that its First Amendment right to express itself on the streets and parks of Parkland [wa]s not being restricted." *Id.* at 1358. In reaching its decision, the *Parkland Republican Club* court relied on the analysis from the district court in *PETA I*. In *PETA I*, the plaintiff argued that the denial of its participation in New York City's CowParade[7] violated its constitutionally protected right to free speech. That court determined that the forum was either "a nonpublic forum or a limited public forum arising from the opening of a nonpublic forum. . . ." *PETA I*, 105 F. Supp. 2d at 319. In granting summary judgment for the defendants, the court reached the logical conclusion that:

> PETA was in no way precluded from access to public spaces or from expressing itself in ways normally permitted on public streets and parks of New York City. Rather, the relief sought by PETA here was access to one of the specific cow statues offered on a limited basis by the event sponsors and for the cow decoration PETA proposed to be displayed in some public *or private* venue as part of the CowParade. PETA's access to traditional public forum space for expressive purposes was neither denied nor otherwise restricted. This case implicates only the extent of a privilege to participate in a public-private enterprise created for limited purposes, with some of the exhibit located on small plots of public land.

*PETA II*, 2000 WL 1639423, at *2.

These two extrajurisdictional district court opinions emphasized one factor that is applicable to the case before us: plaintiffs can express themselves on streets that remain open to the general public. Neither *Parkland Republican Club* nor *PETA I* prohibited plaintiffs from expressing their message on the streets; the courts instead concluded that plaintiffs did not have a right to interfere with the message of another. Moreover, both courts determined that the forum at issue—a parade—was either a limited public forum or a nonpublic forum.

Similarly, in a case that is controlling, we have held that there was no First Amendment violation when a city "permitt[ed] the Bush-Quayle '92 Committee to exclude members of the public from a

---

[6]We stated that *Community for Creative Non-Violence v. Hodel*, 623 F. Supp. 528 (D.D.C. 1985), stood for the proposition that "an otherwise public forum had been converted, partially by virtue of a permit, into a nonpublic forum." *Bishop*, 1987 WL 35970, at **3 n.3. In contrast, we also cited *Irish Subcommittee v. Rhode Island Heritage Commission*, 646 F. Supp. 347 (D.R.I. 1986), which noted that "'[t]o allow the government to limit traditional public forum property and thereby create within it a nonpublic forum would destroy the entire concept of a public forum.'" *Bishop*, 1987 WL 35970, at **3 n.3 (quoting *Irish Subcomm.*, 646 F. Supp. at 347 n.3).

[7]Comprised of public and private organizations, "CowParade consists of approximately 500 life-size fiberglass sculptures of cows in three basic poses which have been painted, decorated or otherwise altered artistically. Individuals and groups . . . were solicited by the CowParade Organizers to become 'patrons,' or sponsors, of CowParade by 'adopting' a cow to be displayed as part of the event." *PETA I*, 105 F. Supp. 2d at 298. A committee was established that "reviewed each of the submitted designs to determine which, if any, were not appropriate for the CowParade." *Id.*

traditional public forum based on the content of their speech." *Sistrunk v. City of Strongsville*, 99 F.3d 194, 196 (6th Cir. 1996). In *Sistrunk*, the permit provided a specific use and was limited to members and invitees. *Id.* This court found that the Committee was engaging in collective expressive activity and it had a right to "exercise its free speech rights and autonomy over the content of its own message." *Id.* at 200. This case is consistent with the Supreme Court's decision in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), where the Court found that requiring a parade-organizer to include a message in the parade that the organizer did not want to convey would violate the organizer's freedom of speech.

This line of case law is distinguishable from the matter before us. Unlike the plaintiffs in the aforementioned cases, Parks does not seek inclusion in the speech of another group. While it is unclear that the Arts Festival was actually expressing a particular message, the City "submitted that the collective message of the Greater Columbus Arts Council is to bring visual and performing artists to the City to be enjoyed by those who wish to go to the festival." Appellee's Br. at 23. This is not an expressive message, but merely a purpose for the event. The Arts Festival is an event that most likely has many artists who are expressing various messages of their own. It is therefore difficult to determine a collective message for the Arts Festival itself. If, however, we were to construe the message of the Arts Festival to be "visual and performance art," nothing in the record indicates that Parks interfered with or prevented this "message" from being conveyed. In fact, Parks was merely another attendee of the festival, walking up and down the street. He was at the festival neither as a vendor nor as a visual or performing artist. His speech, therefore, is not inclusionary under either the precedent of this Circuit or the Supreme Court.

Our "forum analysis is not completed merely by identifying the government property at issue." *Cornelius*, 473 U.S. at 801. We must also look to "the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property." *Id.* Parks sought general access to public property and was not seeking to be included in any collective message of the permit holder. The Arts Festival was not a private event and, in fact, the City Code indicates that the block party permit is obtained for the purpose of "the *community at large*, other than for a parade or commercial activity." Columbia City Code § 923.01 (emphasis added). The permit itself even indicated that the Arts Council's use would be non-exclusive.[8] The fact that the sponsors were required to carry liability insurance, to abide by the safety regulations of the City, or even to regulate the sale of alcohol does not transform the area into a limited forum. If anything, the fact that the permit enumerates only certain liability of the private party supports our conclusion that the City remained in control of the streets; it simply was shielded from liability related to injury. The City cannot, however, claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public. Here, Parks attempted to exercise his First Amendment free speech rights at an arts festival open to all that was held on the streets of downtown Columbus. Under these circumstances, the streets remained a traditional public forum notwithstanding the special permit that was issued to the Arts Council.

### C.

Because Parks's speech was not interfering with the permit holder's message and because the permitted streets remain a traditional public forum, we must consider the City's actions under a traditional public forum analysis. Before determining whether the City has satisfied the appropriate standard, we must first address the issue of state action. The City argues that there was no state action because Officer Farr was off-duty and acting under the directive of the permit holder and because it did not control the streets during the festival. We do not find the City's arguments compelling or consistent with the law.

---

[8] This is not to conclude that Parks's First Amendment rights would vanish if the permit authorized exclusive use. We have indicated that authorization of exclusive use of public property will shift potential liability from the government to the private entity who functions as a state actor. *See, eg., Memphis in May v. Lansing*, 202 F.3d 821, 828 (6th Cir. 2000) (noting that private entity was not liable because it did not have exclusive control over the streets).

First, regardless of whether Officer Farr was on or off duty, he presented himself as a police officer. We have held that "a police officer acts under color of state law when he purports to exercise official authority." *Memphis, Tenn. Area Local Am. Postal Workers Union AFL-CIO v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004). "Such manifestations of official authority include flashing a badge, identifying onself as a police officer, [or] placing an individual under arrest. . . ." *Id.* In this case, Officer Farr was dressed in his official police uniform and his badge was displayed. He identified himself as "Officer Farr" and, while he did not actually arrest Parks (because Parks complied with his order), he nevertheless threatened arrest. We believe that all of these factors combined create the presumption of state action. Thus, Officer Farr was acting as a state actor when he commanded Parks to leave Center Civic Drive.

Second, and equally significant to the specific actions of Officer Farr, the City and its agents supported the permitting scheme that ostensibly provided a permit-holder with unfettered discretion to exclude someone exercising his constitutionally protected rights from a public street. The City issued a permit to the Arts Council that was non-exclusive and open to the public. The streets remained a traditional public forum. After complaining to the City that his First Amendment rights had been violated, Parks received a letter from the City Attorney defending the actions of the permit holder. The letter emphasized that the streets at issue were no longer a public area where Parks's First Amendment rights would apply because a private sponsor was using the area pursuant to City ordinance. The letter argued that the permit allows the permittee to use the street for its purpose, and therefore the "[Arts] Council had every legal right to request Mr. Parks to move on or be arrested." J.A. at 32. The City's policy went as far as to endorse the unfettered discretion of the sponsor; a City representative testified that it is "the practice of the [C]ity in carrying out these ordinances to permit the event organizers to determine what activities will be permitted at the event." *Id.* at 114. We find that all of these factors amounted to state action.[9]

Because the City is a "state actor" for purposes of a claim brought under § 1983, we must now determine whether its actions violated Parks's constitutional rights. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800. Nevertheless, traditional public fora "have been devoted to assembly and debate, [therefore] the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45. The state may only enforce a content-based exclusion if actions meet the strictest scrutiny, and therefore must "show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* On the other hand, "the state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

This case presents us with a unique situation. We are not faced with a challenge to the ordinance in and of itself being an unconstitutional time, place, or manner restriction of Parks's speech. Rather, Parks argues that both the ordinance and permit scheme as applied in this situation are unconstitutional. He claims that the City is attempting to avoid liability by hiding behind the Arts Council, which the City asserts has discretion to exclude whomever it wants.

During the Arts Festival, Parks was acting in a peaceful manner and the only difference between him and the other patrons was that he wore a sign communicating a religious message and distributed religious leaflets. When Officer Farr commanded Parks to move behind the barricaded area, he told Parks that the

---

[9]In determining that there was no state action in the present case, the district court relied upon our decision in *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000). While the facts in *Lansing* are similar to the present case, the issue in *Lansing* was whether a *private* entity was functioning as a state actor. There, the sole issue on appeal was whether "Memphis in May, despite its status as a private corporation, operated as a state actor in ejecting Lansing from the area between the barricades." *Id.* at 828. In this case, however, state action is readily apparent from the acts of City officials. Thus, the district court erred in applying the analysis from *Lansing* to the facts before us.

event sponsor did not want Parks there. The City offered no explanation as to why the sponsor wanted him removed. There is no evidence that the Arts Council had a blanket prohibition on the distribution of literature or that others engaging in similar constitutionally protected activity were removed from the permitted area. While the district court did not reach the question of whether the removal of Parks was based on the content of his speech, under these circumstances we find it difficult to conceive that Parks's removal was based on something other than the content of his speech. We therefore must determine whether the City's action regulating Parks's speech was "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45.

Our analysis here is brief because the City has not offered an interest, let alone a compelling one, to explain why it prohibited Parks from exercising his First Amendment rights in a traditional public forum.[10] The City has consistently maintained that the actions were not its own but rather that of the permit holder. As we discussed above, we reject this argument. We also find inappropriate the district court's speculation that "the permit holders *could* have a rule . . . limiting activities to those that promote the festival's theme or prohibiting the distribution of fliers because the permit holder is responsible for cleaning the permitted area after the event." J.A. at 257-58 (emphasis added). The City offered no evidence of any such rule having been adopted by the Arts Council. Because there is no compelling state interest, we need not reach the second prong of our strict scrutiny analysis.

### III. CONCLUSION

As the Supreme Court has emphasized, "[t]he right to free speech . . . may not be curtailed simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716 (2000). And one's right to free speech "must not, in the guise of regulation, be abridged or denied." *Hague*, 307 U.S. at 516. In the case before us, the City has applied a regulation in such a way that restricts the freedom of speech of one of its citizens. The First Amendment does not tolerate this. We hold today that, in its actions as related to the Arts Festival, the City has violated Parks's First Amendment rights. We therefore **REVERSE** the order of the district court and **REMAND** this case to the district court to enter judgment for Parks and to consider what damages, if any, should be awarded to Parks.

---

[10] Assuming arguendo that the City could establish that its exclusion of Parks was content-neutral, it still has not offered even a significant state interest for the exclusion. "[E]ven content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (referring to an official's overly broad discretion in granting or denying a speech-related permit).