# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1922

_____

| | | |
|---|---|---|
| Bill Wickersham; Maureen Doyle, | * | |
| | * | |
| Plaintiffs/Appellees, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| City of Columbia, | * | District Court for the |
| | * | Western District of Missouri. |
| Defendant, | * | |
| | * | |
| Memorial Day Weekend Salute to | * | |
| Veterans Corporation, | * | |
| | * | |
| Defendant/Appellant. | * | |

_____

Submitted: November 16, 2006
Filed: March 22, 2007

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Bill Wickersham and Maureen Doyle brought this § 1983 action against the City of Columbia and a nonprofit corporation known as the Memorial Day Weekend Salute to Veterans Corporation (Salute), seeking an injunction that would permit them to engage in expressive activities at Salute's Memorial Day air show at the municipal

airport.  The district court[1] concluded that enforcement of the air show rules, which is carried out by city police on behalf of Salute, violated the First Amendment.  It issued a permanent injunction against the city and Salute requiring them to permit certain expressive activities at the annual event.  The city does not appeal but  Salute does, arguing that it is not liable as a state actor for its speech restrictions and that the injunction violates its own First Amendment right to be free from compelled speech.  We affirm.

I.

Since 1993 Salute has staged its annual Memorial Day Weekend Salute to Veterans Air Show at the Columbia Regional Airport.  Although the airport is owned by the city, the city gives Salute control over the tarmac for the show.  The two day event is free and open to the public, and tens of thousands of people attend each year.  In addition to feats of aerial acrobatics performed by military planes, the event features static airplane displays, exhibits by military recruiters, and food on the airport's secured tarmac.  During the noontime hour each day there is a ceremony to honor fallen veterans at which the national anthem is played, the names of fallen Boone County service members are read aloud, and the air show's honored guests are introduced to the crowd.  The stated purpose of the air show is "to honor and remember" service members, past and present.

A resolution passed by the Columbia city council authorizes the city manager to execute a contract with Salute for exclusive control of the airport during the event, subject to the city's right to retake control in the event of an emergency.[2]  Salute does

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[2]The city's resolution and its contract with Salute have remained substantially the same for the past several years.

not pay for this use.  During the remainder of the year the airport is controlled by the city, and the tarmac is not open to general public access.  At the time the city began leasing the airport to Salute for its annual event, the Columbia city code provided that the city could "make no lease or contract with any person...that will impair the City's control of [the] airport and its facilities."  That ordinance was repealed in 2005 after commencement of this litigation.

Salute is responsible for deciding on the content of the air show, including the schedule of events, the list of honored guests, and the exhibits that will be displayed. Salute pays for liability insurance, the sound system, and the fees and incidental costs associated with the use of the military air craft.  City personnel are responsible for operating the airport during Salute's air show, and Salute's president Mary Posner conceded that airport manager Bill Boston, a city employee, is "absolutely essential" to the event's success.  In the past few years, he has borne primary responsibility for developing the Ground Operations Plan for the air show and has coordinated with the Federal Aviation Administration to facilitate the air show's compliance with federal regulations.  Numerous city officials participate in briefings in preparation for the air show.  While Salute receives a variety of services from the city at no charge, as authorized by the city council, it does not receive direct payment of public funds.

Salute must apply to the Department of Defense (DOD) to secure the involvement of the federal military aircraft that are displayed at the air show.  On its application Salute attests each year that the event is "officially supported by local government," one of the requirements for access to the planes.  It also states that the event will be open to the public, another DOD condition for use of its planes.  City Manager Raymond Beck signs the application forms on behalf of the city.  In 2005 the city listed the air show on its website under sections entitled "Guide to City Services" and "Public Works Provided for Residents and Businesses."  Salute includes a disclaimer in its media releases, stating that the air show is presented solely by Salute and should not be referred to as the Columbia Air Show or "any other designation that

would imply it is hosted, organized, or in any way sponsored by the City of Columbia."  The city's contract with Salute also states: "In no event shall the City and the Corporation be deemed or construed to be joint venturers or partners."

Salute imposes a number of restrictions on behavior at the air show, including limits on expressive activities.  Although the list of prohibited conduct differs slightly from time to time in its precise wording, it has included prohibitions against soliciting, petitioning, leafleting, political campaigning, and "unauthorized" signs.  These rules are widely publicized and often appear on Salute's media releases about the air show.  Salute's restrictions apply within the fenced tarmac area which is accessed through several gates.

Columbia police officers provide security at the air show, and it is coordinated by Captain Michael Martin.  Salute provides no reimbursement to the city for the officers' time.  Captain Martin has developed a security plan for the event each year which incorporates Salute's restrictions on expressive activity.  Posner testified in her deposition that she had no personal role in developing the security plan, but that Salute gave directions to the police department about which activities were to be prohibited.  The 2003 version of Martin's security plan stated that "[n]o protests are permitted inside the tarmac fence."[3]  An interoffice memorandum was also circulated in 2004 to instruct police officers about their role in enforcing Salute's speech restrictions.  It included the following:

> Protesters are likely at the show. . . .Should protesters attempt to enter the premises, officers will immediately advise the Command Center and will stop their forward progress.  Officers will advise them of the area being private property and of the restrictions related to carrying signs,

---

[3]Captain Martin stated in his deposition that the plan had been approximately the same from year to year until the 2005 air show, during which Salute and the city were required by the preliminary injunction to permit leafleting.

-4-

seeking signatures to petitions, or demonstrating. Any person who persists in entering will be given a trespass warning prior to arrest. Keep in mind that persons are not restricted from entering, only those who intend to conduct a protest once entry is made.

Police officers are instructed to have their police identification badges visible at all times during the event.

Captain Martin stated in his deposition that the air show was the only event for which he could recall being asked to enforce a private organization's speech restrictions. He stated that Salute's president Mary Posner was the final arbiter of what constituted unwanted protest at the event. He testified further that if she were ever to ask him to remove someone on account of that person's race, he would readily comply.

In 2004 appellee Maureen Doyle attempted to distribute antiwar fliers inside the secured tarmac. A Columbia police officer confronted her and stated that she would be arrested if she continued to hand out leaflets. Soon more officers arrived, and one grabbed leaflets out of her hands. Doyle then left the air show. At that same air show, appellee Bill Wickersham attempted to collect signatures inside the fenced tarmac area on an initiative advocating renewable energy. He was approached by a police officer and advised to cease petitioning. When he refused, the police officer took him to the department's command post at the air show and issued him a trespass warning. After Posner directed that he be arrested for first degree trespassing, the police arrested him at the show but he was never prosecuted.

Wickersham and Doyle brought this action against Salute and the City of Columbia under 42 U.S.C. § 1983, seeking injunctive relief permitting them to distribute leaflets, circulate petitions, and engage in other expressive activities at future air shows. They alleged violations of their First Amendment rights to free expression, characterizing the air show as a public forum. They argued that although

Salute was a private corporation, it was a state actor in its imposition of restrictions on free speech given the degree of joint participation between Salute and the city in staging the air show and enforcing the restrictions. They also claimed that by granting Salute complete discretion to determine who was arrested at the air show, the city had ceded a public function to Salute.

During discovery plaintiffs produced evidence about the joint activity of Salute and the city in staging the air show. Among the depositions they took were those of Mary Posner of Salute and Captain Martin. Captain Martin testified that the police department was responsible for enforcing Salute's speech restrictions as part of the city's agreement to lease Salute the property, and Posner testified that the police discharged this enforcement responsibility "on [Salute's] behalf."

On May 18, 2005 the district court granted a temporary injunction permitting plaintiffs to distribute leaflets and wear expressive clothing at the 2005 air show, but not allowing them to circulate petitions or engage in other forms of solicitation. It found that Salute was a state actor because of the degree to which the city and Salute were intertwined in the staging of the air show. The court also found that the city had delegated a public function to Salute by giving Posner control over the police during the air show. Subsequent to the court's order and prior to the 2005 air show, Salute wrote to the police department disavowing any delegation of police authority and stating that Salute "will play no role in the exercise of authority and discretion by the City Police . . . ."

At the 2005 air show, leafleting and expressive clothing were permitted as required by the temporary injunction; sign carrying was also allowed even though it had not been specifically addressed in the order. At a subsequent deposition, Captain Martin testified that no one had tried to circulate petitions at the 2005 event but that he would have stopped anyone who did, not because such activity violated a city ordinance, but because Salute disapproved it and it was not protected by the temporary

-6-

injunction. A handful of individuals were present inside the secured tarmac at the 2005 event to hand out leaflets or carry signs. Martin observed no disturbances caused by their presence at the air show. Several members of the public did submit written complaints to Salute about the presence of "protestors" on the tarmac. One individual handed out commercial leaflets advertising a nearby restaurant, and Posner later testified that she was concerned that there would be more commercial leafleting at future shows.

On March 3, 2006, after additional depositions and hearings had occurred and evidence about the 2005 air show had been produced, the district court issued a permanent injunction. The injunction incorporated its earlier May 18, 2005 order by reference. As a predicate to its First Amendment analysis, the district court once again found Salute to be a state actor when it enforced its speech restrictions against plaintiffs, because it was entangled with the city in planning the air show and monitoring unwanted expressive activities. It also held the city accountable for the direct role of the police in enforcing the speech restrictions.

The court concluded that the air show was a non public forum in which Salute as a state actor could impose reasonable and neutral regulations without offending the First Amendment, but that a blanket prohibition on leafleting and sign carrying was neither reasonable nor viewpoint neutral. It found that Salute's prohibition on petitioning was permissible, however, because it was both reasonable and uniformly enforced. The district court ordered Salute and the city to permit leafleting, sign carrying, and the wearing of expressive clothing at future air shows subject to reasonable restrictions on time, place, and manner. The court also gave special consideration to Salute's noontime ceremony at the show, ordering that Salute could restrict expressive activities at that daily event and the city could lawfully remove individuals who did not respect those restrictions. The court rejected Salute's argument that it had a First Amendment right to exclude all unwanted forms of expression at its air show, questioning whether a state actor like Salute had First

Amendment rights. Even if it did, the court reasoned, the presence of other messages on the tarmac would not interfere with such rights.

Salute appeals from the final judgment, contesting the district court's conclusion that it was a state actor and arguing that the injunction violates its own First Amendment rights by forcing it to provide a forum for messages it does not support. Although the City of Columbia is also subject to the court's injunction, it has not appealed.

II.

Generally a district court's conclusions of law are reviewed de novo and its findings of fact, for clear error. See Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002) (en banc). Where the First Amendment is implicated, however, we make an "independent examination of the whole record" in assessing the factual predicates of the free speech claim. Id. (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)). We nevertheless continue to apply a clear error standard to facts not directly related to the First Amendment issue, see Doe, 306 F.3d at 621, including the factual predicates to the state action inquiry. See Howerton v. Gabica, 708 F.2d 380, 384 (9th Cir. 1983).

The first Amendment guarantee of free speech guards against abridgment through state action alone. It does not inhibit private restrictions on speech. Hudgens v. NLRB, 424 U.S. 507, 513 (1976). In certain circumstances the government may become so entangled in private conduct that "the deed of an ostensibly private organization or individual is to be treated . . . as if a State had caused it to be performed." Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001).

To ascertain whether there is state action in a case, we examine the record to determine "whether the conduct at issue is 'fairly attributable' to the state." Montano v. Hedgepeth, 120 F.3d 844, 848-849 (8th Cir. 1997) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).  We are guided in this inquiry by two additional queries: whether the claimed deprivation "resulted from the exercise of a right or privilege having its source in state authority" and whether the party engaging in the deprivation "may be appropriately characterized as [a] state actor[]."  See Lugar, 547 U.S. at 939 (internal quotations omitted).  Since Salute's authority to impose speech restrictions at its air show derives from the city's grant to it of temporary control over the airport, Lugar's first prerequisite for state action is met.  See United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 906 n.1 (4th Cir. 1995) (grant of permit to hold festival satisfies first Lugar inquiry).  The key issue is whether Salute may appropriately be considered a state actor in the circumstances presented.  If a party's conduct meets the requirements for state action, the same acts also qualify as actions taken "under color of state law" for purposes of § 1983.  Lugar, 457 U.S. at 935.

The Supreme Court has recognized a number of circumstances in which a private party may be characterized as a state actor, such as where the state has delegated to a private party a power "traditionally exclusively reserved to the State," see Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974), where a private actor is a "willful participant in joint activity with the State or its agents," see Adickes v. S. H. Kress & Co., 398 U.S. 144, 151 (1970), and where there is "pervasive entwinement" between the private entity and the state, see Brentwood, 531 U.S. at 291.  These particular circumstances are merely examples and not intended to be exclusive.  See id. at 295.

Our ultimate conclusion must turn on the particular facts of the case, since "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."  Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961).  The one unyielding requirement is that there be a "close nexus" not merely between the state and the

private party, but between the state and the alleged deprivation itself. See Brentwood, 531 U.S. at 295. No such nexus exists where a private party acts with the mere approval or acquiescence of the state, see Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982), but a private entity may be considered a state actor if it "has acted together with or has obtained significant aid from state officials" in furtherance of the challenged action. Lugar, 457 U.S. at 937.

Salute argues that this case is governed by our decision in Reinhart v. City of Brookings, 84 F.3d 1071 (8th Cir. 1996). In Reinhart, we held that the actions of a private organization in restricting political campaigning at its arts festival could not be attributed to the city, even though the festival took place in a public park. The fact that a city allows a private entity to hold a major event on its property is not sufficient to convert the private conduct of event organizers into state action even where the organizers impose their own rules on expressive conduct, for the state's "mere acquiescence" in an alleged deprivation is not enough. Id. at 1073. The degree of entanglement between the City of Columbia and Salute goes well beyond the relationship in Reinhart. There, the city had no role in planning, advertising, or managing the festival, and the organizers were solely responsible for enforcing the restrictions on expressive activity. Id. at 1072-73.

Here, the city's role was far more than "mere acquiescence," for the city not only provided critical assistance in planning and operating the show, but also played an active role in enforcing the particular speech restrictions challenged in this action. City police, not Salute volunteers, enforce the restrictions every year, a role that Captain Martin characterized as part of "the agreement that's in place" with Salute. The active and prearranged role of the police in effectuating the event's private speech policies also sets this case apart from Lansing v. City of Memphis, 202 F.3d 821 (6th Cir. 2000), another case relied on by Salute. In Lansing, the court specifically noted that the City of Memphis had made no attempt to instruct its officers on how to police unwanted speech activities on festival grounds. Id. at 833-34.

-10-

The direct role of the Columbia police in enforcing Salute's speech restrictions provided the critical nexus, absent in other cases, between the challenged conduct and the exercise of state authority.[4]  See, e.g., Gaston, 43 F.3d at 909 n.4 (appellant conceded absence of nexus); see also D'Amario v. Providence Civic Ctr. Auth., 783 F.2d 1, 3 (1st Cir. 1986) (city officials' enforcement of private speech restriction provides requisite nexus between alleged deprivation and state involvement).

Salute contends that its contract with the city transformed the airport into its own temporary private property,[5] over which it had the right to decide who was welcome and who was not and thereafter to seek police assistance in ejecting trespassers.  To be sure, the mere invocation of state legal procedures, including police assistance, does not convert a private party into a state actor. See Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001) (invoking state assistance to apprehend shoplifter).

The contributions of the Columbia police go beyond the kind of neutral assistance that would normally be offered to private citizens in enforcing the law of trespass. In Griffin v. Maryland, the Supreme Court distinguished between a deputy sheriff's enforcement of trespass law and his active enforcement of a private park's segregation policy, holding that the latter situation amounted to state action. 378 U.S. 130, 136-37 (1964). Here, the police department's security plan instructed the officers to enforce Salute's rules rather city ordinances, and police took an active role in identifying and intercepting protesters at the air show, including Wickersham and Doyle. The city's cooperation with Salute was directed toward effectuating the challenged policy rather than merely keeping the peace. See Howerton v. Gabica, 708

---

[4]Municipalities are state actors for the purpose of § 1983 claims. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

[5]The city's own ordinance prohibited it from ceding control of the airport to Salute or any other party until 2005 when the relevant ordinance was repealed.

-11-

F.2d 380, 385 (9th Cir. 1983) (active and repeated police involvement amounts to state action even though response to citizen's complaint does not).

When a private entity has acted jointly and intentionally with the police pursuant to a "customary plan," it is proper to hold that entity accountable for the actions which it helped bring about. See Murray v. Wal-Mart, Inc., 874 F.2d 555, 558-559 (8th Cir. 1989); see also Dossett v. First State Bank, 399 F.3d 940, 950 (8th Cir. 2005) (applying joint action test for state action to § 1983 action alleging First Amendment violation). In making its findings the district court specifically rejected the suggestion that Salute had asked for nothing more from the city than the use of its property. The record supports the trial court's findings, for it contains evidence of a mutual understanding that city police would work to restrict speech activities at the air show according to Salute's wishes.

Although certain changes occurred between the entry of the temporary and permanent injunctions, including Posner's statement to the police disclaiming authority to direct their actions at the air show, the overall "momentum" of the cooperation remained unaltered. See Brentwood, 531 U.S. at 301 (quoting Evans v. Newton, 382 U.S. 296, 301 (1966)). In its order granting the permanent injunction the district court again found that Salute and the city had acted "like partners" with respect to the 2005 air show and that their mutual understanding about the city's role in enforcing the speech restrictions continued as before.[6] In light of the evidence showing a continuing history of cooperation and Captain Martin's admission that he would have enforced Salute's rules at the 2005 air show even where city ordinances had not been violated, we cannot characterize these findings as clearly erroneous. Even if the police no longer received directions from Salute at the air show or consulted Salute members about whom to arrest, they nevertheless continued to

---

[6]The district court specifically found that "the City knows, when it enters into the temporary lease of the tarmac, that the Corporation will exclude all unauthorized speech and will seek the assistance of the City to enforce those rules."

respond to the broader directives of Salute by enforcing its speech restrictions as part of their security duties. Cf. Brentwood, 531 U.S. at 301 n.4 ("underlying reality" of private entity's relationship to the state often trumps legal formalities erected in attempt to thwart a finding of state action).

Since Salute and the city were knowingly and pervasively entangled in the enforcement of the challenged speech restrictions, we conclude that Salute was a state actor when it interfered with appellees' expressive activities. The district court did therefore not err in holding that Salute's curtailment of appellees' freedom of expression constituted state action and was actionable under § 1983.

Salute next argues that the district court's order requiring it to permit leafleting, sign carrying, and expressive clothing at the air show interferes with its own First Amendment right to control the expressive content of its event, relying on Hurley v. Irish-American Gay, Lesbian & Bisexual Group, 515 U.S. 557 (1995). In Hurley, a state court had ordered a private association to include a group of gays, lesbians, and bisexuals as a marching unit in its St. Patrick's Day Parade in compliance with a state public accommodation law prohibiting discrimination on the basis of sexual orientation. Id. at 562-63. The Supreme Court reversed, holding that application of the state law violated the parade organizer's First Amendment rights since the state cannot compel a private entity to disseminate particular views or to alter its message to suit the government. Id. at 573. Salute cites Hurley as authority for its argument that the order compelling it to permit other messages at its air show violates its First Amendment rights.

Appellees respond that as a state actor Salute cannot assert rights under the First Amendment, echoing the district court's suggestion that state actors do not enjoy the same constitutional rights guaranteed to private entities like the parade organizer in Hurley. Neither appellees nor the district court cited authority for this proposition. Appellees also argue that even if Salute had the full panoply of First Amendment rights, the district court's injunction would not violate those rights because Salute is

not being compelled to affirm any message with which it disagrees; rather it is being required to tolerate the presence of other messages from which it may easily dissociate itself.

Unlike Salute the parade organizer in Hurley was not a state actor, see id. at 566, and there was no question that the organizer maintained its full rights under the First Amendment. The Supreme Court concluded that those rights were violated by the presence of unwanted marching units because they would have altered the organizer's message which was communicated by the composition of the parade. Id. at 576. In contrast Salute has not shown that its message was dependent upon the composition of the crowd at the air show. The competing expressive interests were also considered in Hurley. The Court pointed out that the gay, lesbian, and bisexual group could put on a parade of its own to promote its message, see id. at 578, but appellees here could not likely organize an event similar to the air show in order to advance their views or secure the kind of privileged access to city property that Salute enjoys.

Whether a private entity like Salute forfeits some of its right to deliver its own message unimpeded by others when it assumes the role of state actor need not be decided on this record because Salute has not shown that the injunction infringed its own ability to deliver its chosen message. The district court's injunction protects Salute's daily noontime ceremony in honor and remembrance of veterans from any competing expressive activities, giving Salute complete control over the message that it wants to communicate during this special event. The presence of nondisruptive expressive conduct during the remainder of the air show was not shown to threaten to alter Salute's message. There is no evidence that Salute's message was diluted by the presence of a small number of sign carriers and leafleters at the 2005 air show, which was attended by over 25,000 people. Appellees sought only to express their own views as spectators at the air show, and their signs and leaflets were "not likely [to] be identified" with Salute. See Pruneyard Shopping Ctr. v. Robins, 447 U.S. 74, 87 (1980); see also Parks v. City of Columbus, 395 F.3d 643, 651 (6th Cir. 2005). The

-14-

fact that after the 2005 air show some individuals complained to Salute about the presence of "protesters" at the event speaks to the public's ability to distinguish between Salute's message and any others permitted by the court's injunction. See Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 126 S.Ct. 1297, 1310 (2006).

Unlike the situation in Hurley, where the sponsor had been unconstitutionally required to include in its parade a particular message favored by the state, namely support for the rights of gays, lesbians, and bisexuals, see 515 U.S. at 579, here there is "no specific message . . . dictated by the State to be displayed," mitigating concerns that the government is coercing affirmance of a particular favored viewpoint. See Pruneyard, 447 U.S. at 87. If the City of Columbia has shown any preference for a particular message, it has been for Salute's. The present situation involving a large air show, free and open to the public, has more relevant similarities to Pruneyard, where the Supreme Court held that a mall owner's First Amendment rights were not violated by a state constitutional requirement that he allow petitioning on his property. Id. at 88.

On this record we cannot say that the presence of leafleters and sign carriers interfered with any First Amendment rights Salute might have in the circumstances where its involvement is that of a state actor. In deciding that Salute could not constitutionally prohibit *all* sign carrying and leafleting at its air show, the district court did not hold that Salute could impose *no* restrictions on those activities. Salute remains free to impose reasonable and viewpoint neutral rules related to time, place, and manner. The reasonableness of any restrictions are "assessed in light of the purpose of the forum and all the surrounding circumstances." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 687 (1992) (O'Connor, J., concurring) (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 809 (1985)). Salute remains free to take reasonable steps to ensure that its air show message would not be submerged by any alternate forms of speech which prove to be unduly intrusive in their timing, place, or manner of expression.

-15-

## III.

In sum, the speech restrictions imposed at the annual air show involved state action on the part of Salute because it was consistently entangled with the city in effectuating them, and the district court did not err or abuse its discretion in fashioning the permanent injunction requiring Salute and the city to permit certain expressive activities at this public event. There has been no showing that Salute's constitutional rights were violated by the injunction, and Salute is free to return to the district court if changed circumstances were to warrant modification of the injunction or any other action. Accordingly, we affirm the judgment of the district court.

_____