# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3550

_____

Manda Roberson, individually and on behalf of the Heirs at Law of A.A.R., a minor; Alfonzo Roberson, individually and on behalf of the Heirs at Law of A.A.R., a minor

*Plaintiffs - Appellants*

v.

The Dakota Boys & Girls Ranch; Shauna Faye Holweger, in her individual capacity as a Ranch staff member; Ebony James, in her individual capacity as a Ranch staff member

*Defendants - Appellees*

John Does, 1-2 acting in their individual capacities as supervisors at the Ranch

*Defendant*

_____

Appeal from United States District Court
for the District of North Dakota - Eastern

_____

Submitted: June 15, 2022
Filed: August 2, 2022

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

_____

BENTON, Circuit Judge.

The North Dakota Department of Corrections and Rehabilitation took full custody of a young girl, A.A.R., from her parents and placed her at the Dakota Boys & Girls Ranch, a private psychiatric facility. After only a few months there, A.A.R. committed suicide. Her parents, Manda and Alfonzo Roberson, sued the Ranch and its employees under 42 U.S.C. § 1983. The district court dismissed the Complaint, concluding the Robersons failed to state a plausible claim that the Defendants were state actors under § 1983. Having jurisdiction under 28 U.S.C. § 1291, this Court reverses and remands.

I.

By 12, A.A.R. had been diagnosed with many mental illnesses, including bipolar disorder, borderline personality disorder, and depression, as well as substance abuse involving various intoxicants, including alcohol and opioids. A.A.R. had also stolen a vehicle, damaged others' property after threatening to attack them, and resisted arrest.

On May 16, 2018—after these acts and a number of psychiatric hospitalizations—a North Dakota Juvenile Court found 12-year-old A.A.R. "delinquent," "disobedient," and "unruly," and ordered that she "be removed from the care, custody and control of her parents." **5/16/18 Corrected Juvenile Findings of Fact and Order for Disposition (In Custody**) ¶ 4, 10, DCD 15-6 at 3. The court placed her "under the full care, custody and control of the State Department of Corrections, to be supervised by the Division of Juvenile Services, for placement and care, for a period of one year dating from May 3, 2018."

The court granted the Division of Juvenile Services ("DJS") power to "place [A.A.R.] outside of the parental home and outside of the State of North Dakota, if deemed to be appropriate and in the best interest of the child." The court authorized A.A.R.'s "immediate placement at the Youth Correctional Center in Mandan, North Dakota." The court ordered: "[A.A.R.] and her parents shall fully cooperate with

any recommendations of the Division of Juvenile Services, including any assessments, testing, evaluations, or drug screening."

That same month, A.A.R. was placed at the Youth Correctional Center ("YCC"). On August 2, 2018, A.A.R. attempted to commit suicide there. On August 20, 2018, A.A.R. was taken from the YCC and admitted to the Dakota Boys & Girls Ranch in Fargo, North Dakota. "It was anticipated that A.A.R. would remain at the Ranch for four months."

The Ranch operates a private "psychiatric residential treatment facility" ("PRTF") that provides: psychiatric and other medical care; education at its school; and, recreational and spiritual activities. Shauna Faye Holweger was a Ranch employee who supervised A.A.R.'s "residential pod"; Ebony Rochelle James was another staff member there.

The Ranch developed a comprehensive treatment plan for A.A.R., which included therapy and medication for her mental illnesses. A.A.R. was immediately "placed on a 'line of sight restriction,'" meaning she had to be visually monitored and within eyesight of staff at all times. She remained on this or similar restrictions for much of her time there. At the Ranch, A.A.R. exhibited suicidal ideation, making comments and notes about killing herself.

On October 2, 2018, A.A.R. experienced an emotional breakdown, attempted to escape her residential pod, and effectively held a staff-member "hostage" in that person's office. In response that evening, Holweger told A.A.R. she would not attend school and would lose "studio privileges." This "greatly upset" A.A.R. She soon asked to be admitted to the bathroom, around 9:00 p.m. Upon entering the bathroom, A.A.R. briefly returned to her room, hid a bedsheet under her shirt, and returned to the bathroom. Holweger and James both saw her "grab[] something," and take it into the bathroom, with Holweger "noting that A.A.R.'s shirt looked 'bunchy.'" However, neither of them tried to inspect what A.A.R. had grabbed, or stop her from returning to the bathroom. Instead, Holweger moved A.A.R.'s

-3-

mattress into the pod common area, "standard procedure" for "suicidal residents." A note on the mattress, written by A.A.R., said that A.A.R. "deserves to DIE!"

A.A.R. committed suicide in the bathroom, hanging herself from a doorknob with the bedsheet. Holweger and James were just outside the bathroom, on the other side of the door. Ambulance personnel pronounced A.A.R. dead at 9:53 p.m.

The Robersons sued the Ranch, Holweger, James, and two John Does under § 1983. Count I asserts an Eighth Amendment deliberate indifference claim against Holweger and James. Count II, later voluntarily dismissed, asserted supervisory liability against their supervisors, John Does 1 and 2. Count III asserts a failure-to-train claim against the Ranch.

The Ranch, Holweger, and James jointly moved to dismiss, arguing the Robersons failed to state a claim that they were state actors, as required for § 1983. The district court granted the motion. The Robersons appeal.

II.

This Court reviews "de novo a grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Schulte v. Conopco, Inc.*, 997 F.3d 823, 825 (8th Cir. 2021). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotations omitted). This Court "accept[s] as true all factual allegations in the light most favorable to the nonmoving party." *Id.* (quotations omitted). However, "naked assertions devoid of further factual enhancement," do not suffice, nor do "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up) (quotations omitted). "Rather, the facts alleged must be enough to raise a right to relief above the speculative level." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc) (quotations omitted).

Courts may consider "'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting" a motion to dismiss under Rule 12(b)(6) into one for summary judgment. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017), *quoting Miller v. Redwood Tox. Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). Specifically, this Court properly considers "underlying state court decisions because they [a]re matters of public record." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015).

## A.

Section 1983 makes liable any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" subjects any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. **42 U.S.C. § 1983.** To state a claim under § 1983, "a plaintiff must allege sufficient facts to show '(1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right.'" *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010), *quoting Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009).

"Only a state actor can face § 1983 liability" for acting under color of state law. *Doe v. N. Homes, Inc.*, 11 F.4th 633, 637 (8th Cir. 2021). However, "in a few limited circumstances, a private entity can qualify as a state actor." *Id.* (quotations omitted). Whether a private entity commits state action is a "'necessarily fact-bound inquiry.'" *Id.*, *quoting Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982).

To assess state action, this Court answers two questions. First, "whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority." *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (quotations omitted); *see also Ams. United for Separation of Church &*

*State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 422 (8th Cir. 2007) (assessing first element).

Second, "whether the party engaging in the deprivation may be appropriately characterized as a state actor." *Wickersham*, 481 F.3d at 597 (quotations omitted); *see generally Lugar*, 457 U.S. at 937-39 (establishing and explaining test). This may occur in a few circumstances, including when (1) "'the private entity performs a traditional, exclusive public function,'" or (2) "'the government acts jointly with the private entity.'" *Doe*, 11 F.4th at 637, *quoting Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("*Manhattan Cmty.*"); *see also Wickersham*, 481 F.3d at 597 (listing, as among those circumstances that make the party a state actor: a private party's use of "power traditionally exclusively reserved to the State"; willful participation in a "joint activity with the State"; and "pervasive entwinement" between it and the State (quotations omitted)).

"Our ultimate conclusion must turn on the particular facts of the case, since only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Doe*, 11 F.4th at 637, *quoting Wickersham*, 481 F.3d at 597. "The one unyielding requirement is that there be a close nexus not merely between the state and the private party, but between the state and the alleged deprivation itself." *Wickersham*, 481 F.3d at 597 (quotations omitted). "No such nexus exists where a private party acts with the mere approval or acquiescence of the state." *Id.*

B.

Turning to the first question of the state-actor analysis: the claimed deprivation—here, deliberate indifference to A.A.R.'s medical needs—resulted from the exercise of a right based in state authority—namely, the Ranch's right to provide medical treatment for a person in state custody. *Compare Norfleet ex rel. Norfleet v. Arkansas Dep't of Hum. Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) (stating that "imprisonment is not the only custodial relationship in which the state

must safeguard an individual's rights," and holding "that the state had an obligation to provide adequate medical care, protection and supervision" to asthmatic child because it "took [him] from his caregiver and placed him in foster care"), *with West v. Atkins*, 487 U.S. 42, 55 (1988) (recognizing that the State has a "right to punish [a prisoner] by incarceration and to deny him a venue independent of the State to obtain needed medical care," and holding private doctor was a state actor when he treated a state prisoner).

The parties do not contest this, so this Court need not belabor it. *See* **Roberson Br.** at ii, 13-15 (arguing only the second state-actor question); **Opp'n Br.** at iii, 16 (noting the first state-actor question but never assessing it); *see also* **Manhattan Cmty.**, 139 S. Ct. at 1927-33 (omitting the first question and addressing only the second to answer "whether private operators of public access cable channels are state actors").

Turning to the second question of the state-action test: whether the defendant "may be appropriately characterized as a state actor." **Wickersham**, 581 F.3d at 597 (cleaned up). This characterization is appropriate where an otherwise private actor "perform[ed] a traditional, exclusive public function." **Doe**, 11 F.4th at 637. This may occur "when the government has outsourced one of its constitutional obligations to a private entity." **Manhattan Cmty.**, 139 S. Ct. at 1929 n.1.

In *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court held that a doctor who practiced privately, and who contracted with North Carolina to provide medical treatment to prisoners in a state prison, was a state actor when treating prisoners. *West*, 487 U.S. at 57. Because "the State was constitutionally obligated to provide medical treatment to injured inmates," *West* held that "the delegation of *that traditionally exclusive public function* to a private physician gave rise to a finding of state action." **Am. Mfrs. Mut. Ins. Co. v. Sullivan**, 526 U.S. 40, 55 (1999) (emphasis added); *see also* **Rodriguez v. Plymouth Ambulance Serv.**, 577 F.3d 816, 826 (7th Cir. 2009) (stating *West* applied the public function test). Thus, the Supreme Court has characterized *West* as an instance in which "a private entity" was "deemed a state

actor" because the government "outsourced one of its constitutional obligations"—
the duty "to provide medical care to prison inmates." ***Manhattan Cmty.***, 139 S. Ct.
at 1929 n.1.

Much as North Carolina outsourced its constitutional duty to provide medical
care to a prisoner, North Dakota here outsourced its constitutional duty to provide
medical care to a child in its custody, delegating a traditional, exclusive public
function to the Ranch.

1.

North Dakota had a constitutional obligation to provide A.A.R. adequate
medical care under the Due Process Clause of the Fourteenth Amendment. "When
the State by the affirmative exercise of its power so restrains an individual's liberty
that it renders him unable to care for himself, and at the same time fails to provide
for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and
reasonable safety—it transgresses the substantive limits on state action set by . . . the
Due Process Clause." ***DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.***, 489 U.S.
189, 200 (1989). Thus, "the Due Process Clause imposes a duty on state actors to
protect or care for citizens . . . in custodial and other settings in which the state has
limited the individuals' ability to care for themselves." ***Gregory v. City of Rogers,
Ark.***, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc).

This duty extends to child custody. When a state takes full custody of a child,
the child "loses his freedom and ability to make decisions about his own welfare,
and must rely on the state to take care of his needs." ***Norfleet***, 989 F.2d at 293. As
a result, the state has a constitutional "obligation to provide adequate medical care,
protection and supervision." ***Norfleet***, 989 F.2d at 293 (8th Cir. 1993) (applying
pre- and post-*DeShaney* precedent to find that complaint stated deliberate
indifference claim under § 1983, and qualified immunity did not apply).

The duty to provide medical care applies to psychological care as much as physical. *See Shelton v. Arkansas Dep't of Hum. Servs.*, 677 F.3d 837, 840 (8th Cir. 2012) ("State actors in mental health facilities owe a constitutional-level duty of care to involuntarily held patients."); *DeShaney*, 489 U.S. at 199 ("[T]he Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their reasonable safety from themselves and others." (quotations omitted)); *cf. Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) ("[O]nce one is classified as a suicide risk, the right to be protected from that risk would seem to fall under the ambit of the right to have medical needs addressed.").

When North Dakota took custody of A.A.R., it assumed the duty to give her adequate medical care. DJS had custody of A.A.R. As the Complaint alleges, "A.A.R. became a ward of the state of North Dakota in May of 2018 after numerous legal issues and a number of psychiatric hospitalizations," and, "[a]s a result, . . . was placed at the [YCC]." The May 2018 Order effected these changes. The Order "removed [A.A.R.] from the care, custody and control of her parents," and "placed [her] under the full care, custody and control of the State Department of Corrections, to be supervised by [DJS], . . . for a period of one year dating from May 3, 2018, or further order of the Court." The Order granted DJS "the power to place [A.A.R.] outside of the parental home and outside of the State of North Dakota"; gave DJS the power to consent to emergency medical treatment; and, ordered that "her parents shall fully cooperate with any recommendations of the Division of Juvenile Services including any assessments, testing, evaluations or drug screening," as well as sign "any and all release of information forms authorizing" DJS to exchange information necessary to treat A.A.R.

By these orders, DJS had sole "care, custody and control" of A.A.R. from May 2018 to May 2019—including in October 2018, when A.A.R. committed suicide at the Ranch. DJS alone could select her treatment facility and medical

providers. Her parents were legally required to comply with DJS's choices and could not remove her from the Ranch.[1]

Moreover, the Complaint does not allege—and the Ranch does not argue—that, after the May 2018 Order, custody over A.A.R. changed, or that an entity other than DJS sought her admission to the Ranch and controlled whether she remained there. In light of the allegations and May 2018 Order, inferring any of these alternatives would violate the requirement that the Complaint be read in the light most favorable to the non-movant at the motion-to-dismiss stage. *See Schulte*, 997 F.3d at 825 (providing standard).

The district court violated the motion-to-dismiss standard when it concluded that the Complaint, read in conjunction with the May 2018 Order, contains "no factual allegations that the only medical care A.A.R. could have received was that provided by the State of North Dakota." **MTD Order** at 9 n.3, 10, DCD 26. This conclusion is not possible without drawing an inference contrary to the Complaint and against the Robersons: that DJS lost custody of A.A.R., and some other person could select her medical providers.

Because North Dakota took custody of A.A.R., it had a constitutional duty to provide adequate medical care to her. *See Norfleet*, 989 F.2d at 293 (holding the "state had an obligation to provide adequate medical care, protection and supervision" to minor where it took him "from his caregiver and placed him in foster care"); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990) (finding that, where "the state removed a child from the custody of her parents," it could not

---

[1]The Ranch's counsel underscored this at the district court's Motion to Dismiss hearing. *See* **MTD Tr.** 15:22-16:9, DCD 32 ("[A.A.R.'s P]arents [did not] have the ability to come and take her out of the facility. . . . Based on the court order [from] juvenile court, that is a decision that is left to [DJS]. But at all times [DJS] could have come at any point in time, picked A.A.R. up and moved her to another facility, taken her somewhere else. . . . [T]he the custody and control at all times still rested with the State of North Dakota.").

"place her in a position of danger"—or impair her "mental health"—"without thereby violating her rights under the due process clause of the Fourteenth Amendment").

2.

North Dakota outsourced its constitutional obligation to the Ranch. DJS had custody of A.A.R. during her time at the Ranch, and sole discretion to choose her medical providers. DJS removed A.A.R. from YCC and applied for PRTF admission to the Ranch for an expected four-month period. After admitting A.A.R, the Ranch took complete day-to-day responsibility for every aspect of her care, from medication and therapy to school and housing. *See* **Compl.** ¶¶ 59, 66 (detailing prescription changes by the Ranch); ¶ 47 (identifying "therapy plan" and frequency); ¶¶ 36, 78, 90 (discussing attendance at and ban from Ranch school); ¶¶ 36, 78-79, 93, 111 (discussing A.A.R's housing at the Ranch). It did so under a medical treatment plan with DJS input. The Ranch listed a "DJS Worker – Aimee DeSherlia" as the only person, other than Ranch staff and her parents, "involved in A.A.R's treatment" under her "Treatment Plan." DJS's decision to remove A.A.R. from YCC and place her at the Ranch for PRTF care—18 days after A.A.R.'s suicide attempt at YCC—outsourced DJS's obligation for A.A.R.'s medical treatment to the Ranch.

Moreover, the expectation that A.A.R. would stay at the Ranch, a PRTF, for only "four months," until "December 2018"—well before DJS's custody would end in May 2019 under the court's May 2018 Order—reinforces that DJS placed her at the Ranch not for a permanent placement, but for critical medical care. *See* **Compl.** ¶ 32.

Where North Dakota "outsourced one of its constitutional obligations"—the duty to provide adequate medical care—to the Ranch, that "private entity may . . . be deemed a state actor." ***Manhattan Cmty.***, 139 S. Ct. at 1929 n.1.

-11-

3.

North Dakota had a constitutional obligation under the Due Process Clause, which the Ranch assumed. Thus, this Court need not assess whether the State had a similar obligation under the Eighth Amendment. However, the parties focused much of their analysis on *West* and subsequent Eighth Amendment cases. That precedent reinforces that the Ranch was a state actor here.

The Fourteenth Amendment precedent for a state's duty to provide medical care to persons in state custody draws upon, and is intertwined with, the Eighth Amendment precedent for a state's duty to provide medical care to prisoners. *See, e.g.*, **DeShaney**, 489 U.S. at 198 (stating that "the Eighth Amendment[] . . . requires the State to provide adequate medical care to incarcerated prisoners" under *Estelle v. Gamble*, 429 U.S. 97 (1976), while the "Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients" with services "to ensure their reasonable safety" under *Youngberg v. Romeo*, 457 U.S. 307 (1982), and summarizing that "when the State . . . so restrains an individual's liberty that it renders him unable to care for himself, and . . . fails to provide for his . . . medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause"); **Norfleet**, 989 F.2d at 291 (8th Cir. 1993) (describing *Youngberg* as taking *Estelle*'s reasoning—"that the Eighth Amendment requires a state to provide adequate medical care to incarcerated prisoners because a prisoner cannot care for himself and must rely on prison officials to treat his medical needs"—and applying "this analysis . . . to involuntarily committed mental patients" under the Fourteenth Amendment).

Given the similarities between states' obligations to people in their custody under the Eighth and Fourteenth Amendments, Eighth Amendment state-action precedent is persuasive here. *See* **Dolihite v. Maughon ex rel. Videon**, 74 F.3d 1027, 1044 (11th Cir. 1996) (citing *West* for the proposition that, "[a]s physicians under contract with the state, [private] psychiatrists were state actors subject to liability under § 1983" for Fourteenth Amendment due process violation); **West**, 487 U.S. at

58 (Scalia, J., concurring in part and concurring in the judgment) (agreeing that private doctor was a state actor, but arguing the doctor violated the Fourteenth Amendment Due Process Clause, not the Eighth Amendment).

Providing medical care to a state detainee is a performance of a traditional, exclusive public function. *See West*, 487 U.S. at 57; *Am. Mfrs.*, 526 U.S. at 55. Under *West*, a private medical facility conducts this public function even if it also treats non-state detainees or lacks a financial contract with the state. "It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *West*, 487 U.S. at 55-56. "[T]he dispositive issue concerns the relationship among the State, the physician, and the prisoner." *Id.* at 56.

In *Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994), the Fourth Circuit held that "private physicians who treat state prisoners *without the benefit of a contract*" are state actors under *West*. *Conner*, 42 F.3d at 225 (emphasis added) (holding so where neither private doctor nor facility were employed by or had contracts with the state, *see id.* at 222). Whether a physician or facility "has a contractual duty or simply treats a prisoner without a formal arrangement," the provider's function is the same: the state authorizes the person "to provide medical care," and "the prisoner has no choice but to accept the treatment offered by the physician." *Id.* at 225. Thus:

> If a physician treating a prisoner—whether by contract or by referral—misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law. The source of the deprivation does not change because the physician has no contractual relationship with the state: the physician acts under color of state law because the state has incarcerated the prisoner and denied him the possibility of obtaining adequate medical care on his own.

-13-

*Id.* While the prison in *Conner* paid the doctor for his services, the court emphasized the doctor "had the state's authorization to treat" the prisoner and could do so "only because he was so authorized by the state." *Id.* Similarly, although the doctor used a private facility and "his own equipment," the doctor remained a state actor because "the physician's function while working for the state, not the place where he performs his duties," determines his status. *Id.* at 226. The doctor's function in the state system, and his authorization to treat the prisoner, were dispositive—not the location or a contract. The doctor "acted under color of state law because he assumed the state's constitutional obligation to provide medical care." *Id.*

Similarly, in *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816 (7th Cir. 2009), the Seventh Circuit held that staff members at private hospital were state actors where the hospital treated a prisoner for multiple days. *Rodriguez*, 577 F.3d at 831 (affirming dismissal of hospital where complaint named only staff and did not allege a policy or failure to train, but reversing dismissal of staff because "the allegations [against them] are sufficient to state a claim under [§] 1983," *id.* at 832).

The court identified two critical facts that showed the hospital's treatment "was tied to . . . his overall medical care" and "acting in the stead of the state in providing" that care. *Id.* First, the facility placed the prisoner "in a prison ward of the hospital," which showed "an ongoing relationship with prison authorities for the care of prisoner-patients." *Id.* Second, the plaintiff's time at the hospital "was not simply for emergency treatment, but [for] a stay of several days." *Id.* This showed the facility assumed "the state's special responsibility to incarcerated persons," and had not acted purely on "a preexisting obligation to serve all persons who present themselves for emergency treatment." *Id.* at 827.

Just as in *Rodriguez*, the Ranch's relationship to DJS makes it and its employees state actors here. First, the Ranch maintained a clear, ongoing relationship with DJS by providing long-term treatment to A.A.R. on behalf of DJS. Only DJS could remove A.A.R. from YCC and apply for PRTF admission to the Ranch, and the Ranch chose to admit A.A.R. Moreover, the Ranch had a DJS

-14-

employee involved in A.A.R.'s treatment plan. These allegations show the Ranch knew of DJS's involvement and undertook to treat A.A.R., a state ward. The absence of a contract allegation does not change its role in providing medical care on behalf of the State. *Cf. **Conner***, 42 F.3d at 225 (holding "private physicians who treat state prisoners without the benefit of a contract" are state actors); *cf. also **Rodriguez***, 577 F.3d at 827 (acknowledging that "*West* tells us that the contractual relationship between the state and the medical care provider cannot be the *focus* of our inquiry," and instead focusing on whether the provider "assume[d] the state's responsibility for" treating prisoners).

Second, the Ranch's months-long treatment of A.A.R. reinforces that it assumed the State's role in her medical care. DJS transferred A.A.R. to the Ranch for an expected four-month period, and the Ranch treated her 24-hours a day for almost three months. This far exceeds the "several days" found adequate in *Rodriguez*. *See **Rodriguez***, 577 F.3d at 831. Moreover, the expectation that A.A.R.'s stay at the Ranch would end months before DJS's custody underscores that DJS placed her at the Ranch for medical care. The Ranch's assumption of all medical treatment for A.A.R. from the State makes it a state actor. *Cf. **Rodriguez***, 577 F.3d at 831-32.

*West*, *Conner*, and *Rodriguez* make clear that in this circumstance, a private medical provider is a state actor regardless of whether it has a contract with, or receives payment from, the state. *See, e.g.*, ***West***, 487 U.S. at 56 n.15 ("[A]lthough the provision of medical services is a function traditionally performed by private individuals, the context in which [the provider] performs these services for the State (*quite apart from the source of remuneration*) distinguishes the relationship between [him] and [the prisoner] from the ordinary physician-patient relationship." (emphasis added)).

Just as in *Conner*, A.A.R. had "no choice but to accept the treatment offered by the" Ranch because DJS took full custody and control of her, placed her at the Ranch, and "denied h[er] the possibility of obtaining adequate medical care on h[er]

own." *See* **Conner**, 42 F.3d at 225. The Ranch, meanwhile, "had the state's authorization to treat" A.A.R. and could do so "only because [it] was so authorized by the state." *See* **id.** "[N]o one fact can function as a necessary condition across the board for finding state action." **Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n**, 531 U.S. 288, 295 (2001). But here the allegations and Order state a claim that the Ranch was a state actor regardless of whether it had any formal contractual or pecuniary relationship with the State.

Finally, the Ranch argues that it was "acting with mere approval or acquiescence of the state," because "treatment at a PRTF is not based on an individual's status as a prisoner and admission to a PRTF is not incarceration in the State system," citing *Sabri v. Whittier All.*, 833 F.3d 995, 1000 (8th Cir. 2016), and North Dakota Administrative Code chapter 75-03-17, which establishes PRTF requirements.

*West* rejects this theory. "Defendants are not removed from the purview of § 1983 simply because they are professionals acting in accordance with professional discretion and judgment." **West**, 487 U.S. at 52. In *West*, the doctor's use of professional, medical judgment did not preclude him from being a state actor. *See* **id.** at 51-52. Rather, the salient fact was that "his relationship with other prison authorities was *cooperative*." **See id.** at 51 (emphasis added). "It is the physician's function within the state system . . . that determines whether his actions can fairly be attributed to the State." **Id.** at 55-56.

So too here. That the Ranch attempted to provide the medical treatment and did so in compliance with North Dakota's PRTF requirements is no different from the doctor in *West* treating prisoners while complying with his independent "professional and ethical obligations." **Id.** at 51.

The critical facts are that the Ranch cooperated with North Dakota, that A.A.R. could receive treatment only from it, and that it functioned as A.A.R.'s medical provider "within the state system," **West**, 487 U.S. at 55; *see* **Conner**, 42

F.3d at 224 ("The fact that physicians are professionals exercising their own independent professional judgment does not determine whether they act under color of state law when treating prisoners."). These facts make it a state actor. *Cf. Conner*, 42 F.3d at 225 ("[The doctor] acted under color of state law even though he had no obligation—either through direct employment or by contractual arrangement—to accept [the prisoner] as a patient.").

By assuming North Dakota's constitutional obligation to provide A.A.R.'s medical treatment, the Ranch became a state actor. The Robersons state a plausible claim against it under § 1983.

III.

The Roberson also state a plausible claim against the Ranch's employees. They allege that Holweger and James were Ranch employees tasked with monitoring A.A.R. and ensuring her safety under the treatment plan. The Complaint details Holweger's and James's positions and failure to prevent A.A.R.'s suicide. The Defendants do not contest that a finding of state action by the Ranch establishes state action by its employees. Because the Robersons plausibly allege the Ranch was a state actor, its employees were too. *See Rodriguez*, 577 F.3d at 832 (finding complaint stated plausible § 1983 claims against hospital's staff members where it alleged facts showing the hospital itself was a state actor).

\* \* \* \* \* \* \*

The judgment is reversed and the case remanded.
_____